Wayne M. MILLER, Appellant,

v.

COMMONWEALTH of Kentucky,
Appellee.

No. 2000–SC–1079–MR.

Supreme Court of Kentucky.

June 13, 2002.

Emily Holt, Department of Public Advocacy, Frankfort, KY, for appellant.

A.B. Chandler, III, Attorney General, State Capitol, Frankfort, KY, Courtney J. Hightower, Assistant Attorney General, Office of Attorney General, Criminal Appellate Division, Frankfort, KY, for appellee.

COOPER, Justice.

Following a one-day trial in the Taylor Circuit Court, Appellant Wayne M. Miller was convicted of 150 counts of rape in the first degree (25 Class A felonies, 125 Class B felonies), 75 counts of sodomy in the first degree (13 Class A felonies, 62 Class B felonies), and one count of intimidating a witness. He was sentenced to a total of 5,643 years in prison:

> 1,250 years — 50 years each for 25 counts of Class A rape
> 2,500 years — 20 years each for 125 counts of Class B rape
> 650 years — 50 years each for 13 counts of Class A sodomy
> 1,240 years — 20 years each for 62 counts of Class B sodomy
> 3 years — one count of intimidating a witness

Judgment was entered ordering the sentences for rape and sodomy to run consecutively for a total of 5,640 years and the sentence for intimidating a witness to run concurrently with the sentences for rape and sodomy. Pursuant to a post-judgment motion and KRS 532.110(1)(c), the aggregate sentence was modified to 70 years. Appellant appeals to this Court as a matter of right. Ky. Const. § 110(2)(b). We reverse and remand for a new trial because of the erroneous admission of hearsay evidence and evidence of the habits of others. Because the case is being remanded for a new trial, we will also address unpreserved issues with respect to the sufficiency of the evidence and the jury instructions. We will not address claims of error pertaining to jury selection and use of leading questions as they are unlikely to recur upon retrial.

The victim of these alleged offenses, A.M., is Appellant's biological daughter. She was born on January 28, 1985 and was fifteen years of age when this trial was held on August 3, 2000. She testified that at approximately the end of July or the first of August when she was eleven years old (1996), Appellant came to her bedroom, put her on the bed, removed her clothes, removed his own clothes, and had sexual intercourse with her. She then testified that Appellant thereafter had sexual intercourse with her "almost every weekend," except for "about ten weeks per year," and two to four times per week during eight of those forty-two weeks when she would visit Appellant's home "when I was out there a week at a time and when I would stay there during the summer" and "during intersession." Until January 1998, Appellant and A.M., along with A.M.'s mother, Dorothy Miller, now Darst, and A.M.'s younger sister, lived together in a residence near Merrimac, Kentucky. In January 1998, Appellant and Darst separated, and Darst and the children moved to Campbellsville. Thereafter, A.M. and her sister visited with Appellant at the Merrimac residence on weekends and for extended periods during summers and school intersessions.

A.M. further testified that "not long after" the first instance of sexual intercourse, Appellant sodomized her by placing his mouth on her vagina and that he repeated that act "every other time" that he had sexual intercourse with her. Except for the first occasion of sexual intercourse and the first occasion of sodomy, A.M. did not describe any facts surrounding the 225 individual acts of rape and sodomy of which Appellant was convicted. She testified that Appellant last engaged in sexual intercourse with her four weeks prior to September 23, 1999, the date of

her interview with Kentucky State Police Sergeant Linda Rudzinski. A.M. did not testify that she was sodomized on that occasion.

Sergeant Rudzinski testified that Appellant admitted to her that he had sexual intercourse with A.M. on one occasion when A.M. was eleven years old. An acquaintance, Correne Wilson, testified that Appellant once admitted to her that "[e]verything that has been said about me I have done to [A.M.]." Appellant denied at trial that he had ever engaged in sexual intercourse or sodomy with A.M.

## I. HEARSAY.

At the conclusion of his examination of A.M., the prosecutor produced three handwritten documents and asked A.M. if she had written them. She responded affirmatively, and the documents were marked for identification as Exhibits 1, 2 and 3. As more fully discussed below, one of the documents also contained statements written by A.M.'s best friend, "Shonda" (not further identified). A.M.'s mother, Dorothy Darst, then testified that she found the documents in a dresser drawer in A.M.'s bedroom in September 1999. After Darst identified A.M.'s handwriting on each document, all three documents were formally introduced as trial exhibits. Darst then read in open court all of the statements in the documents that were in A.M.'s handwriting.

Exhibit 1 is a note apparently passed back and forth between A.M. and "Shonda" and contains handwritten statements by both children. The statements attributed to Shonda were not read in open court, but the entire exhibit was made available for the jury to consider during deliberations. The document reads as follows (spelling and punctuation errors corrected):

Shonda,

I found out Sun. night that I'm not. After I did, I called Tommie and told him the whole story and that I'm not. He got mad and hung up the phone. He called back and apologized and begged me to forgive him. I did.

[A.M.]

\* \* \*

OK! I am glad that you're not. Don't do that anymore or you'll get in trouble by your mom.

\* \* \*

My mom will never know nothing. *My dad tried again. This time I was asleep. I did not know until I got up the next morning finding him. Shonda I'm scared.*

\* \* \*

You need to go to the guidance office! Tell them what is going on. *If you don't he could end up killing you! Trust me! I had a friend that died because it had happened to her!* TELL SOMEONE! (Emphasis added.)

Exhibit 2 is a handwritten letter from A.M. to Shonda that reads as follows (spelling and punctuation errors corrected):

Shonda,

What's up? Nothing here. My mom found our letters about me and Jacob. I got grounded and I have to go to the doctor, because she thinks that I'm pregnant and when I told her that I'm not, she said that she don't believe me and I still going to the doctor. Man. She even showed the letters to my pastor's wife and I got kicked out of the youth choir and off the praise team. I'm so mad I might go live with my dad. But I still can't believe that she went through my stuff and read all my letters.

Exhibit 3 is a letter from A.M. to "Linda," A.M.'s school counselor, and reads as follows (spelling and punctuation errors corrected):

Linda,

I am writing to you because it is easier for me to write about how I feel and all instead of talking about it. Like when we were talking about my depression. It's not just normal teenage depression. It's something else that I don't like to talk about. Because I'm trying to block it out of my memory. It's so bad I haven't told anybody except for God, and I only told him once and didn't feel comfortable telling him about it. So I don't try to remember it.

I've got to ask you a question. Why do guys always lose respect for you after you have sex with them? Because, before me and Jacob split up, we had sex and he lost total respect for me. I mean I gave something special to him. I gave him my second virginity. (*The reason I gave him my second virginity is because someone stole my first one from me, but I don't like to talk about it. It's personal.*) I mean why did he do that to me? He bugged me and bugged me to do it and when I finally did, he treated me like a total bitch afterwards.

But don't you know what's strange about it is the weekend after me and Jacob broke up, I met Tommie, which I hadn't seen since I was eleven, at a National Youth Conference in Indianapolis, Indiana, and it ends up him asking me out. But don't worry. I won't do something stupid twice in a row.

[A.M.]

P.S. Do not show this letter to anyone. And I mean anyone.

(Emphasis added.)

Presumably, the letters written to Shonda and Linda were never mailed or delivered. At face value, these three documents tend more to prove that A.M. was having sexual relations with "Jacob" and, perhaps, "Tommie," than with Appellant, except for the reference in Exhibit 1 that Appellant "tried" again and that A.M. woke up and found him in her bed, and the statement in Exhibit 3 that an unidentified person had "stolen" her virginity. Nothing in these documents specifically accuses Appellant of engaging in sexual intercourse or sodomy with A.M. Darst, however, insisted that A.M. had never had a boyfriend. A.M. then returned to the witness stand and testified that "Jacob" and "Tommie" do not exist and that her references to these imaginary boyfriends were, in fact, disguised references to her sexual relationship with Appellant.

Exhibits 1, 2 and 3 were all pure hearsay, *i.e.*, out-of-court statements offered to prove the truth of the matters asserted. KRE 801(c). There are only three circumstances when a prior hearsay statement of a witness is admissible as substantive evidence at trial: (1) when the prior statement is inconsistent with the witness's present testimony; (2) when the prior statement is consistent with the witness's present testimony and is offered to rebut an express or implied charge against the declarant of recent fabrication or improper influence or motive; or (3) when the prior statement is one of identification of a person made after perceiving the person. KRS 801A(a). The statements attributed to A.M. in Exhibits 1, 2 and 3 were not inconsistent with her trial testimony and did not pertain to any identification procedure. Although Appellant did suggest in his testimony that A.M. had been influenced by Darst to accuse him of sexual misconduct because of her desire to terminate his visitation rights, the docu-

ments themselves (1) do not tend to refute that charge and (2) were prepared after the alleged motive for fabrication arose. *Slaven v. Commonwealth,* Ky., 962 S.W.2d 845, 858 (1997); *Smith v. Commonwealth,* Ky., 920 S.W.2d 514, 517 (1995). In fact, the statements were introduced during the prosecutor's case-in-chief, not in rebuttal, and defense counsel did not even cross-examine A.M., much less suggest that her testimony was recently fabricated or improperly influenced or motivated.

The fact that A.M.'s mother found documents implicating Appellant in sexual misconduct involving A.M. arguably would have been relevant to show why A.M.'s mother reported A.M.'s allegations to the police (though the documents tended more to refute her allegations than to support them). However, that fact did not become an issue until Appellant testified; thus, if the prosecutor had offered the documents for that purpose, he would have offered them in rebuttal, not during the Commonwealth's case-in-chief. Regardless, that issue could have been resolved without reading the letters to the jury or introducing them as trial exhibits.

■ Under no theory could Exhibit 1 have been properly admitted without deleting all of the statements attributed to "Shonda." Those statements clearly implied that Shonda knew Appellant was sexually abusing A.M. and believed A.M.'s life was in danger as a result. Shonda did not testify at trial, nor could she have testified to such improper hearsay and opinion evidence. Instead, her hearsay and opinion evidence was inserted into the jury's deliberations without being subjected to cross-examination. The admission of these hearsay documents was clearly prejudicial and requires reversal for a new trial. *Berrier v. Bizer,* Ky., 57 S.W.3d 271, 274–76 (2001); *cf. Mills v. Commonwealth,* Ky., 44 S.W.3d 366, 371–72 (2001).

## II. EVIDENCE OF HABITS OF OTHERS.

■ Kentucky State Police Sergeant Linda Rudzinski specializes in child sexual abuse investigations and claimed at trial to have investigated 900 to 1,000 such cases during the three years immediately preceding September 23, 1999, the date she interviewed A.M. Rudzinski testified as follows during direct examination by the prosecutor:

Q. Has it been your experience to observe a delay in the date on which a crime is allegedly committed and when it may be reported by these children?

Defense counsel: Objection.

Court: Overruled.

A. Yes, in 90% of the cases I investigate, there is a delay in reporting.

Q. Based on your experience in this particular case, is this an example of delayed reporting?

Defense counsel: Objection.

Court: Approach. (A bench conference ensued, following which the prosecutor stated he would rephrase the question.)

Q. Your experience is that in 90% of the cases you deal with, that you've dealt with, there has been a lapse of time before they were reported?

A. Yes, regarding child sex abuse cases, yes.

There could be only two possible purposes for this line of questioning: (1) to prove that A.M. had, in fact, been abused because, like other abused children, she delayed reporting the abuse; or (2) to disprove an inference of fabrication arising from the delay in reporting. The argument on appeal has centered on whether this testimony amounted to "child sexual abuse accommodation syndrome" (CSAAS) evidence and whether such evidence,

deemed inadmissible in *Bussey v. Commonwealth,* Ky., 697 S.W.2d 139 (1985) and its progeny up to and including *Newkirk v. Commonwealth,* Ky., 937 S.W.2d 690 (1996), was rendered admissible by our decision in *Stringer v. Commonwealth,* Ky., 956 S.W.2d 883 (1997), *cert. denied,* 523 U.S. 1052, 118 S.Ct. 1374, 140 L.Ed.2d 522 (1998). The *Bussey* line of cases held that an expert's medical or psychological diagnosis that a child victim was experiencing symptoms of CSAAS was inadmissible either because CSAAS was not a diagnosis generally accepted in the relevant scientific community, *Bussey,* at 141, or because such evidence "may invade the province of the jury by unduly influencing its assessment of credibility." *Newkirk,* at 693. Rudzinski, however, is not an expert and was not purporting to render a medical opinion that A.M. was suffering from CSAAS. She was offering empirical evidence of her observation of the habit of other abused children, as a class, to delay reporting sexual abuse as proof either that A.M. was sexually abused or that an inference of fabrication should not arise from the fact that she delayed reporting the sexual abuse.

■ In *Johnson v. Commonwealth,* Ky., 885 S.W.2d 951 (1994), the defendant was convicted of wanton murder after driving his coal truck through a red light and colliding with another vehicle, causing the death of the driver of the other vehicle. At trial, the following occurred during the prosecutor's cross-examination of the defendant:

Q. Okay. Some people, who drive these coal trucks make it a practice to run red lights and blow horns, so people will back off and let them come through even though the light is red....

Defense counsel: Objection, your Honor.

The Court: Overruled. This is cross examination.

Q. Isn't it a fact that that's what you were doing on that particular day?

A. No it wasn't.

*Id.* at 953. In reversing, we held that "[t]o permit the Commonwealth to cross examine about the habit of a class of individuals for the purpose of showing how one unique individual in that class might have acted on a given occasion would invite the jury to arbitrarily hold an individual responsible based on his membership in the class." *Id.* at 953. Thus, a party cannot introduce evidence of the habit of a class of individuals either to prove that another member of the class acted the same way under similar circumstances or to prove that the person was a member of that class *because* he/she acted the same way under similar circumstances. Rudzinski's testimony as to her observation of the habits of sexually abused children, as a class, should have been excluded as irrelevant.

## III. SUFFICIENCY OF THE EVIDENCE/INSTRUCTIONS.

With respect to the sexual offenses, the indictment charged Appellant with 166 counts of first-degree rape *either* "with a child under the age of 12" (Class A felony, KRS 510.040(1)(b)(2)), *or* "by force or threat of force after her 12th birthday" (Class B felony, KRS 510.040(1)(a)); and 166 counts of first-degree sodomy *either* "with a child under the age of 12" (Class A felony, KRS 510.070(1)(b)(2)), *or* "by force or threat of force after her 12th birthday" (Class B felony, KRS 510.070(1)(a)). Based on A.M.'s testimony, the trial court selected July 31, 1996, through September 1, 1999, as the maximum inclusive dates of the sexual offenses, which was then rounded to three years; then, mathematically extrapolating A.M.'s testimony as to the frequency of the offenses, instructed the jury that it could find Appellant guilty of

150 counts of first-degree rape (once per week for 34 weeks and twice per week for eight additional weeks = 50 offenses per year × 3 years), and 75 counts of first-degree sodomy ("every other time" she was raped). The instructions under which Appellant was convicted of rape and sodomy read as follows:

## INSTRUCTION NO. 1

### FIRST–DEGREE RAPE (Counts 150)

You will find the Defendant guilty of First–Degree Rape under this Instruction if, and only if, you believe from the evidence beyond a reasonable doubt all of the following:

A. That in this county on or about beginning July 31, 1996 and continuing through September 1, 1999, for a maximum of 150 occasions, and before the finding of the indictment herein, he engaged in sexual intercourse with [A.M.];
AND

B. That at the time of such intercourse *[A.M.] was less than 12 years old OR that he did so by forcible compulsion.*

If you find the Defendant guilty under this Instruction, you shall say so by your verdict and nothing more. You shall make a separate finding for each of the counts.

(Emphasis added.)

## INSTRUCTION NO. 4

### FIRST–DEGREE SODOMY (Counts 75)

You will find the Defendant guilty of First–Degree Sodomy under this Instruction if, and only if, you believe from the evidence beyond a reasonable doubt all of the following:

A. That in this county on or about beginning July 31, 1996 and continuing through September 1, 1999, for a maxi-

mum of 75 occasions, and before the finding of the indictment herein, he engaged in deviate sexual intercourse with [A.M.];
AND

B. That at the time of such intercourse *[A.M.] was less than 12 years old OR that he did so by forcible compulsion.*

If you find the Defendant guilty under this Instruction, you shall say so by your verdict and nothing more. You shall make a separate finding for each of the counts.

(Emphasis added.)

In the event the jury did not find forcible compulsion, the instructions also defined lesser included offenses of 100 counts of second-degree rape and 50 counts of second-degree sodomy occurring between January 28, 1997, A.M.'s twelfth birthday, and January 28, 1999, her fourteenth birthday (Class C felonies, KRS 510.050 and KRS 510.080); and 34 counts of third-degree rape and 17 counts of third-degree sodomy occurring between January 28, 1999 and September 1, 1999 (Class D felonies, KRS 510.090).

Perhaps, it was assumed that the jury would designate which counts of first-degree rape and first-degree sodomy were premised upon A.M. being less than twelve years of age, *i.e.,* those that occurred prior to January 28, 1997, and which counts were premised upon forcible compulsion. However, the verdict forms made no such distinction, and the jury returned verdicts simply finding Appellant guilty of 150 counts of first-degree rape and 75 counts of first-degree sodomy. Obviously, no construction of A.M.'s testimony would support Appellant's convictions of 225 Class A felonies.

A defendant cannot be convicted of a criminal offense except by a unanimous

verdict. Ky. Const. § 7, as interpreted in *Cannon v. Commonwealth,* 291 Ky. 50, 163 S.W.2d 15 (1942); RCr 9.82(1). We have held that a "combination" instruction permitting a conviction of the same offense under either of two alternative theories does not deprive a defendant of his right to a unanimous verdict if there is evidence to support a conviction under either theory. *Johnson v. Commonwealth,* Ky., 12 S.W.3d 258, 265–66 (1999) and cases cited therein. Otherwise, the verdict cannot be shown to be unanimous, and the conviction must be reversed. *Burnett v. Commonwealth,* Ky., 31 S.W.3d 878, 883 (2000); *Hayes v. Commonwealth,* Ky., 625 S.W.2d 583, 584 (1981); *Boulder v. Commonwealth,* Ky., 610 S.W.2d 615, 617 (1980), *overruled on other grounds, Dale v. Commonwealth,* Ky., 715 S.W.2d 227 (1986). Here, the "combination" instructions on first-degree rape and first-degree sodomy did not describe two alternative theories by which the same offense could be committed but described offenses of two different classes, a Class A felony and a Class B felony. Furthermore, as will be more fully discussed below, there was insufficient evidence even by mathematical extrapolation to support more than thirty Class A felony convictions and insufficient evidence of forcible compulsion to support any Class B felony convictions. For both reasons, Appellant was denied his right to unanimous verdicts with respect to his rape and sodomy convictions.

█ Worse, again applying mathematical calculations, the trial court simply *designated* twenty-five (1/6th) of the first-degree rape convictions and thirteen (rounded up from 12.5, also 1/6th) of the first-degree sodomy convictions as Class A felonies and the remaining 125 counts of first-degree rape and 62 counts of first-degree sodomy as Class B felonies; and so instructed the jury during the penalty phase of the trial. By designating which of the otherwise undesignated convictions were Class A felonies and which were Class B felonies, the trial court usurped the authority of the jury and effectively denied Appellant his right to a jury trial on that issue.

The mathematical calculations upon which the guilt phase instructions were premised did not take into account the undisputed testimony that Appellant and A.M. did not begin living in separate residences until January 1998; thus, none of the offenses that occurred "two to four times per week" when she would visit Appellant's home "when I was out there a week at a time and when I would stay there during the summer" and "during intersession" could have occurred prior to January 1998. Thus, applying the formula used by the trial judge and momentarily disregarding the element of forcible compulsion, the maximum number of offenses authorized by mathematical extrapolation of A.M.'s testimony were:

1. July 31, 1996 to January 27, 1997: 25 weeks $\times$ 42/52 = 20 first-degree rapes and 10 first-degree sodomies (Class A felonies, victim under age 12);

2. January 28, 1997 to January 27, 1998 (A.M. and Appellant began living in separate residences): 42 second-degree rapes and 21 second-degree sodomies (Class C felonies, victim under age 14);

3. January 28, 1998 to January 27, 1999: 50 second-degree rapes (once per week for 34 weeks and twice per week for 8 weeks) and 25 second-degree sodomies;

4. January 28, 1999 to September 1, 1999: 31 weeks $\times$ 42/52 = 25 weeks at once per week + 4.7 weeks (8 $\times$ 31/52) at twice per week = 29.7 (rounded to 29) third-degree rapes and 14.85 (rounded to 14) third-degree sodomies (Class D felonies, victim under 16, KRS 510.090).

[All of the above illustrates why multiple convictions must be premised on more precise evidence than mere mathematical calculations.]

Thus, disregarding the element of forcible compulsion, a mathematical extrapolation of A.M.'s testimony warranted instructions on only the following:

20 counts of first-degree rape;
92 counts of second-degree rape;
29 counts of third-degree rape;

141 total.

10 counts of first-degree sodomy;
46 counts of second-degree sodomy;
14 counts of third-degree sodomy;

70 total.

■ There was no evidence that any of the offenses were accompanied by forcible compulsion. A.M.'s only testimony in this respect was as follows:

Q. [D]id you ever want to do this?

A. No.

Q. During any of these times, from the time it started until the time it stopped, was it ever your idea?

A. No.

Q. Did you ever tell him to stop?

A. Yes.

Q. What would he say?

A. He'd say OK.

Q. He did what?

A. He would say OK.

Q. Would he usually stop if you asked him to?

A. Un-huh [indicating yes].

In fact, A.M. testified that on the first occasion that she had sexual intercourse with Appellant, he stopped when she kicked him. The prosecutor conceded at the instructions conference that the only evidence of forcible compulsion was that A.M. did not give Appellant her permission to have sexual relations with her. Of course, A.M.'s "permission," *i.e.*, consent, or lack thereof, was immaterial because she was statutorily incapable of consenting. KRS 510.020(3)(a). That is the very premise of what is sometimes referred to as "statutory rape." KRS 510.010(2) defines "forcible compulsion" as "physical force or threat of physical force, express or implied, which places a person in fear of immediate death, physical injury to self or another person, fear of the immediate kidnap of self or another person, or fear of any offense under this chapter. Physical resistance on the part of the victim shall not be necessary to meet this definition."

There is little case law interpreting KRS 510.010(2) and none since the last sentence was added by a 1996 amendment. 1996 Ky.Acts., ch. 300, § 2. In *Van Dyke v. Commonwealth,* Ky., 581 S.W.2d 563 (1979), evidence that the defendant forcibly entered the victim's apartment and threatened to kill her four-year-old child if she did not comply with his sexual demands was deemed sufficient. In *Salsman v. Commonwealth,* Ky.App., 565 S.W.2d 638 (1978), the victim's testimony that she did not resist because she feared the defendant would hurt her was deemed sufficient. And in *Yarnell v. Commonwealth,* Ky., 833 S.W.2d 834 (1992), evidence that the child victims were subjected to constant emotional, verbal, and physical duress, lived in fear of what the defendant might do to them or their mother, and submitted to the deviate sexual behavior only because of this fear was deemed sufficient. Here, A.M. did not testify that Appellant used physical force against her or threatened to harm her or another if she refused his sexual advances, or that she submitted to Appellant's advances out of fear of harm to herself or another. The only threat she described was that, on one unspecified occasion, Appellant told her they would both get in trouble if she told anyone what they were doing. While that might explain delayed reporting, it does not prove that A.M. was compelled by force or threat to

submit to sexual intercourse or oral sodomy. A.M.'s only expression of fear was in the handwritten note she wrote to "Shonda" that should have been excluded as hearsay.

■ It is now elementary that the burden is on the government in a criminal case to prove every element of the charged offense beyond a reasonable doubt and that the failure to do so is an error of Constitutional magnitude.

Lest there remain any doubt about the constitutional stature of the reasonable-doubt standard, we explicitly hold that the Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged.

*In re Winship,* 397 U.S. 358, 364, 90 S.Ct. 1068, 1073, 25 L.Ed.2d 368 (1970). *See also* KRS 500.070(1); *Perkins v. Commonwealth,* Ky.App., 694 S.W.2d 721 (1985). There being no evidence that any of the sexual offenses in this case were committed by forcible compulsion, it was error to instruct the jury on Class B first-degree rape and sodomy.

■ Nor can multiple similar offenses be proven by mere mathematical extrapolation. We held in *Hampton v. Commonwealth,* Ky., 666 S.W.2d 737 (1984), that proof of the precise dates on which the offenses were committed is not required of a child sexual abuse victim where the evidence is "ample to separately identify the various offenses charged." *Id.* at 740; *see also Garrett v. Commonwealth,* Ky., 48 S.W.3d 6, 10 (2001); *Stringer v. Commonwealth, supra,* at 886. In each of those cases, the victims described a distinct factual basis for each separate charge so that the jury could determine in each instance whether a separate criminal offense had been committed. *See also State v. Rudd,* 759 S.W.2d 625, 630 (Mo.Ct.App.1988) ("[I]f multiple offenses are submitted against a single defendant, the different offenses submitted should be distinguished. As much is inherent in the well established rule that the giving of distinctive instructions is the proper method of submitting multiple offenses."); *State v. Wood,* 311 N.C. 739, 319 S.E.2d 247, 249 (1984) ("Nonsuit may not be allowed on the ground that the State's evidence fails to fix any definite time for the offense *where there is sufficient evidence that defendant committed each essential act of the offense.*" (Emphasis added.))

■ Whether the issue is viewed as one of insufficient evidence, or double jeopardy, or denial of a unanimous verdict, when multiple offenses are charged in a single indictment, the Commonwealth must introduce evidence sufficient to prove each offense and to differentiate each count from the others, and the jury must be separately instructed on each charged offense. Mere mathematical extrapolation of a described offense based on such vague testimony as "almost every other weekend," "about ten weeks per year," or "every other time" will not support convictions of separate offenses.[1] If these issues had been properly preserved for appellate review, we would vacate all but two of the rape convictions and all but one of the sodomy convictions and remand for a retrial only of the first alleged rape as a Class A felony, the last alleged rape as a Class D felony, and the first alleged sodomy as a Class A felony (as well as the charge of intimidating a witness, for which a new trial is granted only because of the eviden-

---

1. However, such evidence of other crimes of the same nature perpetrated against the same victim would be admissible to prove intent, motive or plan to commit the specifically described offense. *Price v. Commonwealth,* Ky., 31 S.W.3d 885, 888, n. 4 (2000).

tiary errors described in Parts I and II of this Opinion).

■ However, defense counsel neither objected to any of these erroneous instructions nor tendered any instructions on Appellant's behalf. RCr 9.54(2). Although counsel did move for a directed verdict on grounds of insufficiency of the evidence, there was sufficient evidence to convict Appellant not only of two rapes and one sodomy, but also of the offense of intimidating a witness. "When the evidence is insufficient to sustain the burden of proof on one or more, but less than all, of the issues presented by a case, the correct procedure is to object to the giving of instructions on those particular issues." *Kimbrough v. Commonwealth*, Ky., 550 S.W.2d 525, 529 (1977). *See also Commonwealth v. Wolford*, Ky., 4 S.W.3d 534, 535–36 (1999). Upon this state of the case, Appellant is entitled only to a new trial on all counts of the indictment. However, if the evidence is the same, he will be entitled to directed verdicts of acquittal with respect to those counts unsupported by sufficient evidence to distinguish them as separate offenses.

Accordingly, the judgments of conviction and sentences imposed upon Appellant are reversed, and this case is remanded to the Taylor Circuit Court for a new trial in accordance with this Opinion.

LAMBERT, C.J., GRAVES, JOHNSTONE, KELLER and STUMBO, JJ., concur.

WINTERSHEIMER, J., dissents by separate opinion.

WINTERSHEIMER, Justice, dissenting.

I respectfully dissent from the majority opinion because I believe the admission of the letters into evidence was not error; that the testimony concerning the delay in reporting was not error and that the instructions were not erroneous.

It was not reversible error to admit into evidence letters written by the victim. Miller claims that the letters should not have been read to the jury because they constituted inadmissible hearsay. He relies on *Hellstrom v. Commonwealth*, Ky., 825 S.W.2d 612 (1992), but a careful reading of *Hellstrom, supra*, indicates that the language relied on by Miller is actually the dissenting opinion in that case. Moreover, *Hellstrom* was decided before the adoption of the present Kentucky Rules of Evidence and is thus not applicable here.

On direct examination, the victim testified that the letters in question belonged to her. However, these letters were not introduced through her testimony but were read by her mother during the testimony of the mother. The letters contained two statements implicating Miller in the crimes. Subsequently, the Commonwealth recalled the victim to the stand to testify regarding the letters after they had been introduced. Miller had the opportunity to confront and cross examine the witness regarding the letters. The error, if any, was harmless. RCr 9.24.

The trial judge did not commit reversible error in allowing the investigating officer to testify that in 90 percent of the cases she investigated there was a delay in reporting by the victim. At trial the officer testified that this victim waited three years to report the alleged sexual abuse. The officer did not testify as an expert on the subject of "child sexual abuse accommodation syndrome." She only testified regarding her experiences in sexual abuse cases that she had investigated. *See Sargent v. Commonwealth*, Ky., 813 S.W.2d 801 (1991).

Finally, the trial judge did not err when he instructed the jury on the 150 counts of

first-degree rape and 75 counts of first-degree sodomy. The victim testified that for several years Miller would force her to have sex with him almost every weekend and sometimes more often. The victim testified in great detail about the events. A careful review of the record demonstrates that there was sufficient evidence presented to instruct the jury on the numerous counts of rape and sodomy. It was not necessary for the prosecution to elicit testimony from the victim about the specifics of each incident. The trial judge properly denied the motion for a directed verdict under the standards set out in *Commonwealth v. Benham,* Ky., 816 S.W.2d 186 (1991).

Under all the circumstances, the judgment of conviction should be affirmed.