# IMPORTANT NOTICE
## NOT TO BE PUBLISHED OPINION

THIS OPINION IS DESIGNATED "NOT TO BE PUBLISHED." PURSUANT TO THE RULES OF CIVIL PROCEDURE PROMULGATED BY THE SUPREME COURT, CR 76.28(4)(C), THIS OPINION IS NOT TO BE PUBLISHED AND SHALL NOT BE CITED OR USED AS BINDING PRECEDENT IN ANY OTHER CASE IN ANY COURT OF THIS STATE; HOWEVER, UNPUBLISHED KENTUCKY APPELLATE DECISIONS, RENDERED AFTER JANUARY 1, 2003, MAY BE CITED FOR CONSIDERATION BY THE COURT IF THERE IS NO PUBLISHED OPINION THAT WOULD ADEQUATELY ADDRESS THE ISSUE BEFORE THE COURT. OPINIONS CITED FOR CONSIDERATION BY THE COURT SHALL BE SET OUT AS AN UNPUBLISHED DECISION IN THE FILED DOCUMENT AND A COPY OF THE ENTIRE DECISION SHALL BE TENDERED ALONG WITH THE DOCUMENT TO THE COURT AND ALL PARTIES TO THE ACTION.

RENDERED: OCTOBER 28, 2021
NOT TO BE PUBLISHED

# Supreme Court of Kentucky

2020-SC-0251-MR

ROBERT WAYNE CLINE                          APPELLANT


V.             ON APPEAL FROM WARREN CIRCUIT COURT
HONORABLE JOHN GRISE, JUDGE
NO. 18-CR-00889


COMMONWEALTH OF KENTUCKY                APPELLEE


**MEMORANDUM OPINION OF THE COURT**

**<u>AFFIRMING</u>**

Robert Wayne Cline was convicted following a jury trial in Warren Circuit Court of two counts of rape in the first degree with the victim being under twelve years of age. Cline received a sentence of twenty-five years' imprisonment on each count, with the sentences to be served concurrently. He now appeals as a matter of right[1] raising four allegations of error. We affirm.

## I. Facts and Procedural Background

On April 2, 2018, Warren County Sheriff's Detective Evan Cook received a report of alleged sexual abuse perpetrated by Cline against his minor step-daughter, Amy.[2] The allegations stemmed from events which occurred three or

---

[1] Ky. Const. §110(2)(b).

[2] "Amy" is a pseudonym we use here to protect the anonymity of the child victim/witness.

four years prior to the report date.  Following an investigation, Cline was directly indicted for two counts of rape in the first degree.  At a trial convened in March 2020, the jury heard testimony from Amy, her mother, her paternal grandmother, Cline, and Detective Cook.  The following factual background is gleaned from that testimony.

In 2014, Cline began dating April, a woman 24 years his junior and the daughter of one of his good friends.  April moved into Cline's house in the summer of 2014.  April had two daughters from her prior marriages to Daniel.[3]  The oldest, Amy, spent most of her time with Daniel, while the youngest primarily lived with April.  The girls stayed together on weekends, alternating between parents.  Daniel obtained full custody of the girls in October 2015 and refused to permit them to visit Cline's home.  April was granted supervised visitation.  She and Cline married on June 4, 2016, following which April did not visit Amy again.

One night during the 2014-2015 school year while it was cold outside, Amy awoke with a dry throat.  She went to the kitchen to get a drink of water and saw Cline sitting in the living room wearing only boxer shorts.  Amy stated Cline approached her, grabbed her arm, and forced her into his bedroom.  Cline pushed her to the bed, placed one leg on top of her, pulled up her nightgown, and pulled down her panties.  He then removed his boxer shorts and penetrated her vagina with his penis.  Cline moved back and forth and

_____

[3] April and Daniel were married to each other twice.  Each marriage produced a daughter.

2

began moaning. When he withdrew, Cline left semen on Amy's leg, then returned to the living room. Amy went back to her room, wiped off the semen, and cried herself to asleep. She did not tell anyone what happened.

The following weekend, Cline woke Amy up sometime during the night. He pulled her from the top bunk where she had been sleeping and dragged her to his bedroom. Again, Cline pulled up her nightgown, pulled down her panties, and penetrated her vagina with his penis. Amy believed she saw someone—possibly April—in the doorway during the assault. Cline rocked back and forth inside of Amy but did not ejaculate. He returned to the living room and Amy returned to her own room. She said she was too scared at that time to seek out her mother.

Approximately a week later, Amy informed April what had happened. April responded Cline would not do such things and dismissed the allegations. In late March 2018 Amy told Daniel and her paternal grandmother about the rapes. The following week, Amy's therapist recorded an interview about the incidents. Shortly thereafter, a forensic interview was conducted at Barren River Area Child Advocacy Center. Subsequently, a report was made to the Warren County Sheriff's Office and Detective Cook began his investigation.

Based on the delay between the incidents and the reporting, Detective Cook testified his investigation was different from one in which the rape was recent. In delayed reporting cases, he indicated physical or trace evidence would likely have perished or could no longer be collected, witnesses are more difficult to locate, and obtaining specific details from witnesses about what

3

happened is hampered.  He did not attempt to collect any forensic evidence, nor did he request a physical or medical examination of Amy.

Detective Cook interviewed Cline and April separately at their home. Cline admitted his relationship with Amy was strained and denied ever spending any time alone with her.  Cline indicated Amy wanted him out of the picture so April and Daniel could get back together.  He and April each believed Daniel encouraged Amy to fabricate the allegations.  Cline categorically denied sexually abusing Amy.  April told Detective Cook if he could get Amy away from Daniel the truth would come out.

Although April had initially told Detective Cook she moved in with Cline in 2014, she and Cline later testified the actual date they began cohabitating was in September of 2015, shortly before April lost custody of the girls.  Based on that date, they insisted there was no way Cline could have perpetrated the acts he was accused of and the allegations had to be false.  Further, April stated the girls were never at her house on consecutive weekends, so Amy's story could not be true.  April testified Cline was never alone with Amy and denied Amy ever reported any sexual abuse to her.  She blamed Daniel for "putting stuff in her head" and trying to use Amy to break up her relationship with Cline.

Amy's grandmother told the jury since her disclosure, Amy had gained confidence and self-esteem and had amassed a small group of friends.  Her sleep had improved.  Before that time, Amy had seemed quiet, withdrawn, angry, and sad.  She had been hesitant and scared to stay with April and Cline.

4

Amy still harbored anger toward her mother. The grandmother contradicted April and Cline's claims Amy was never left alone with Cline, recounting statements directly made by April.

The jury found Cline guilty of both counts of rape. In accordance with the jury's recommendation, Cline was sentenced to an aggregate term of twenty-five years' imprisonment. This appeal followed.

## II. Analysis

Cline raises four allegations of error in seeking reversal. First, he asserts indistinguishable counts in the indictment and flaws in the jury instructions deprived him of a unanimous verdict. Second, Cline argues the evidence presented at trial was insufficient to support the jury's verdict and he should have been granted a directed verdict of acquittal. Third, he contends the trial court erroneously permitted the Commonwealth to present victim impact testimony in the guilt phase of trial. Finally, Cline maintains Detective Cook's testimony regarding challenges in investigating "delayed reporting" crimes impermissibly reduced the Commonwealth's burden of proof. Cline concedes his first, third, and fourth alleged errors are unpreserved for appellate review and requests palpable error review of those issues under RCr[4] 10.26. He asserts his second argument was properly preserved for review by his motions for directed verdict, a position challenged by the Commonwealth. No request for palpable error review is made as to that argument.

---

[4] Kentucky Rules of Criminal Procedure.

5

Pursuant to RCr 10.26, a palpable error occurs if a defendant's substantial rights are affected and a manifest injustice occurs. *Martin v. Commonwealth*, 207 S.W.3d 1, 2 (Ky. 2006). Such injustice occurs only when the alleged error seriously affected the "fairness, integrity or public reputation of the judicial proceedings." *Id.* at 4 (citation omitted); *Brewer v. Commonwealth*, 206 S.W.3d 343, 349 (Ky. 2006).

In *Brewer*, this Court stated:

> For an error to be palpable, it must be "easily perceptible, plain, obvious and readily noticeable." A palpable error "must involve prejudice more egregious than that occurring in reversible error[.]" A palpable error must be so grave in nature that if it were uncorrected, it would seriously affect the fairness of the proceedings. Thus, what a palpable error analysis "boils down to" is whether the reviewing court believes there is a "substantial possibility" that the result in the case would have been different without the error. If not, the error cannot be palpable.

206 S.W.3d at 349 (footnotes omitted). *Brewer* was later strengthened, requiring the probability "of a different result or error so fundamental as to threaten [an appellant's] entitlement to due process of law" must exist. *Martin*, 207 S.W.3d at 3. With these standards in mind, we turn to Cline's allegations of error.

### A. Challenges to Indictment and Jury Instructions

Cline first argues the indictment and jury instructions were flawed and denied him proper notice of the offenses for which he stood charged and deprived him of a unanimous verdict. We disagree. Cline cannot now, for the first time on appeal, challenge the indictment as defective as RCr 8.18(1) plainly requires such assertions be presented in the trial court. Under that

6

rule, "defenses or objections based on defects in the indictment may be raised only by a motion before trial, and failure to present any such objections constitutes a waiver thereof. The defective indictment argument, therefore, was not properly preserved for appellate review." *Wood v. Commonwealth*, 567 S.W.2d 121, 123 (Ky. 1978).

Cline contends the jury instructions were not sufficiently specific enough to ensure the jury would be able to differentiate between the two counts of rape and thus ensure the verdicts were unanimous. Although this allegation is unpreserved, we have held "all unanimous-verdict violations constitute palpable error resulting in manifest injustice." *King v. Commonwealth,* 554 S.W.3d 343, 351 (Ky. 2018). The instruction for Count One stated, in pertinent part: "That in this county on or between July 17, 2014, and October 30, 2015, before the finding of the indictment herein, [Cline] engaged in sexual intercourse with [Amy] in his bedroom of his residence after taking [Amy] from the kitchen into his bedroom[.]" The instruction for Count Two was quite similar, stating: "That in this county on or between July 17, 2014, and October 30, 2015, before the finding of the indictment herein, [Cline] engaged in sexual intercourse with [Amy] in his bedroom of his residence after taking [Amy] from her bedroom into his bedroom[.]" Cline contends the distinction in the two instructions is meager and insufficient to assure him of a unanimous verdict. He avers the testimony from Amy elicited by the Commonwealth at trial was vague and inconsistent, thereby exacerbating the problem. Cline cites

7

no case law supportive of his claim, but rather recounts additional language he believes could have been inserted to further distinguish the two counts.

The Commonwealth counters the instructions sufficiently identified and differentiated the two charged acts under the facts of this case. Amy was twice raped by Cline on dates about which she was uncertain, but she was certain where she was when each act began—first in the kitchen, and second in her bunkbed. The Commonwealth maintains including these distinctions in the instructions was sufficient. We agree.

> Whether the issue is viewed as one of insufficient evidence, or double jeopardy, or denial of a unanimous verdict, when multiple offenses are charged in a single indictment, *the Commonwealth must introduce evidence sufficient to prove each offense and to differentiate each count from the others, and the jury must be separately instructed on each charged offense.*

*Id.* at 353-54 (quoting *Miller v. Commonwealth*, 77 S.W.3d 566, 576 (Ky. 2002)). Our review of the record reveals the instructions appropriately included the statutory elements of the offense for which Cline stood charged. Each of the instructions further identifies the specific act, based on the evidence adduced at trial, the jury was to consider in making its decision. Cline was charged with two counts of rape and Amy testified as to only two instances of rape, both of which occurred in Cline's bed. Amy distinguished the two instances by telling the jury her location when Cline began the assaults along with other unique facts specific to the different offenses. Inclusion of the differentiating starting locations pertaining to each instance of rape was sufficient to ensure no uncertainty exists as to the crime the jury convicted Cline of on each count.

8

Cline was not deprived of a unanimous verdict. There was no error, palpable or otherwise.

## B. Entitlement to Directed Verdict

Cline next argues the evidence adduced at trial was insufficient to convict him of either count of rape and he was therefore entitled to a directed verdict. As previously noted, Cline asserts this argument was preserved by his directed verdict motions, while the Commonwealth contends it is unpreserved because no specific reasons were presented supportive of the motions. We agree with the Commonwealth.

Our review of the record reveals trial counsel thrice made perfunctory motions for directed verdict, offering no indication or argument as to the grounds for same. As we stated recently, "[t]he defendant's motions for directed verdict must be specific about the particular charge the Commonwealth failed to prove, and state the specific element(s) of that charge the Commonwealth failed to prove." *Ray v. Commonwealth*, 611 S.W.3d 250, 257-58 (Ky. 2020), *cert. denied,* No. 20-8236, 2021 WL 4508153 (Oct. 4, 2021). *See also* CR[5] 50.01 ("A motion for a directed verdict shall state the specific grounds therefor."); *Potts v. Commonwealth,* 172 S.W.3d 345, 347-48 (Ky. 2005) (mere motion for directed verdict without stating specific ground for relief inadequate to preserve issue on review). We do not believe this issue was properly preserved for review.

---

[5] Kentucky Rules of Civil Procedure.

Nevertheless, we believe there was sufficient evidence to support Cline's convictions. "On appellate review, the test of a directed verdict is, if under the evidence as a whole, it would be clearly unreasonable for a jury to find guilt, only then the defendant is entitled to a directed verdict of acquittal." *Commonwealth v. Benham,* 816 S.W.2d 186, 187 (Ky. 1991). At trial, Amy testified to two specific instances of rape perpetrated by Cline. Although Cline and April offered differing testimony challenging Amy's version of events, the jury was free to believe Amy's testimony, and it was not clearly unreasonable for them to do so. Cline was not entitled to a directed verdict of acquittal.

## C. Introduction of Victim Impact Testimony in Guilt Phase

Next, Cline asserts the Commonwealth improperly introduced victim impact testimony during the guilt phase when Amy's grandmother was permitted to testify regarding Amy's demeanor before and after the rapes. Although he objected during the grandmother's testimony, the grounds for that objection were wholly different from the challenge espoused on appeal. Conceding the lack of preservation, Cline requests palpable error review.

During her testimony, the grandmother was asked to provide her observations of Amy's demeanor and emotional state in the time leading up to the rapes. She testified Amy was a normal little girl growing up. Following the incidents, Amy became sad, withdrawn, and would have little to say when returning from visits with April at Cline's residence. In the months preceding trial, Amy had begun acting more normal. The grandmother was not asked to explain the significance of Amy's behavior nor did she elaborate on her belief as

10

to the root cause of the changes.  She merely recounted her personal observations.

Evidence of emotional injuries is directly relevant to prove an alleged victim was sexually assaulted and becomes more relevant when the alleged perpetrator denies the improper conduct occurred.  *Dickerson v. Commonwealth*, 174 S.W.3d 451, 471-72 (Ky. 2005).  Behaviors that are within the common experience of ordinary people have nearly-universally recognized significance and are admissible when probative of a fact in issue.  *Blount v. Commonwealth*, 392 S.W.3d 393, 397 n.3 (Ky. 2013).  The testimony elicited by the Commonwealth was nothing more than a common experience of a grandmother watching her grandchild grow and observing her demeanor. There was no attempt to arouse sympathy or to inflame the jury.  Introduction of the testimony was proper, and no palpable error occurred.

### D.  Detective Cook's Testimony

Finally, Cline contends the trial court erred in permitting Detective Cook to testify about the effect of delayed reporting of sexual offenses on investigations and the collection of evidence.  He asserts this testimony acted to lower the Commonwealth's burden of proof by explaining away the lack of physical evidence.  Cline further argues the Detective's testimony justifying the delay in Amy's disclosure improperly bolstered the Commonwealth's case by implying such delays were normal in child sexual assault cases.  He likens Detective Cook's statements to prohibited Child Sexual Abuse Accommodation

11

Syndrome (CSAAS) testimony.[6]  Acknowledging a failure of preservation, Cline requests palpable error review.  We discern no error.

Detective Cook generally outlined the differences in investigative techniques and procedures in recent sexual assault cases and those for which reporting does not occur for a significant period of time.  His testimony was mainly centered on how he conducted the investigation into Amy's allegations and why he did not make attempts to collect physical evidence.  Contrary to Cline's assertions, none of Detective Cook's statements crossed into the prohibited realm of CSAAS testimony.  He offered no opinion on the commonness or normality of delayed reporting in child rape cases.  Detective Cook made no insinuation Amy's delay in speaking out was evidence the rapes happened.  He did not attempt to bolster Amy's testimony.  He did not suggest the delay was consistent with other child sex abuse victims.  In short, the detective's testimony, which focused on his investigative practices, was not improper.  Cline's allegation to the contrary is without merit.  There was no error.

### III.  Conclusion

For the foregoing reasons, the judgment of the Warren Circuit Court is affirmed.

All sitting.  All concur.

---

[6] "[T]his Court has consistently held that the symptoms, or signs, of the 'so-called' child sexual abuse accommodation syndrome are not admissible" because they lack scientific acceptance.  *Blount*, 392 S.W.3d at 395.

COUNSEL FOR APPELLANT:

Michael Lawrence Goodwin


COUNSEL FOR APPELLEE:

Daniel J. Cameron
Attorney General of Kentucky

James Daryl Havey
Assistant Attorney General