Joseph Thomas JAMES, Appellant,

v.

COMMONWEALTH of Kentucky, Appellee.

No. 2010–SC–000275–MR.

Supreme Court of Kentucky.

Feb. 23, 2012.

Daniel T. Goyette, Louisville Metro Public Defender, Elizabeth B. McMahon, Assistant Public Defender, Office of the Louisville Metro Public Defender, Louisville, KY, for appellant.

Jack Conway, Attorney General, Courtney J. Hightower, Assistant Attorney General, Office of Attorney General, Criminal Appellate Division, Frankfort, KY, for appellee.

Opinion of the Court by Justice NOBLE.

Appellant, Joseph Thomas James, was convicted of first-degree rape, first-degree unlawful imprisonment, fourth-degree assault, violating a protective order, and being a persistent felony offender (PFO). On appeal, he claims the trial court erred by denying his motion for a directed verdict, the prosecutor failed to disclose exculpatory statements, hearsay evidence was improperly admitted, an incomplete version of his own statements to police was introduced, and prior consistent statements of a witness were improperly admitted. None of these claims of error requires reversal.

## I. Background

Appellant and Heather Frazier were involved in a tumultuous relationship for several years that began in 2002. On multiple occasions Heather claimed Appellant hit her. After the first year, she began obtaining a series of emergency protective orders (EPOs) and domestic violence orders (DVOs). Some of these times she would "cry wolf" to the police and falsely claim Appellant had hit her so the police would incarcerate him. On these occasions, Heather would in fact injure herself and tell authorities that Appellant had caused the injury. These incidents occurred when Appellant would threaten to leave her.

Despite the court orders in place, both parties repeatedly violated their no-contact requirement. On the dates at issue in this case, January 16 and 17, 2008, in violation of an existing domestic violence order, they were staying in the same apartment. On the evening of January 16, 2008, Appellant returned to the apartment. Heather testified that he banged on the door, and that when she opened it, he immediately began to beat her. Heather said that Appellant was mad because he had found a letter she had written to another man. She said that while he was beating her, she attempted to block the blows, but he continued to hit and smack her. She said that he grabbed her hair, dragged her across the room, kicked her, and spit on her. She testified that Appellant punched her in the face and head, kicked her in the ribs and in the back, and put his hands around her throat and threatened to kill her. The beating continued for approximately five

hours and was constant except when Appellant would take short breaks.

During one of his rest periods, Appellant crossed the room and lit a cigarette. When he turned around, Heather noticed he had an erection. She testified that she believed if she allowed sexual intercourse, he would stop beating her. She said that when he moved back across the room, he took a towel and wiped the blood from her face and kissed her. The two then engaged in sexual intercourse. She testified that she performed oral sex, that he performed oral sex on her, and that he digitally penetrated her vagina and her anus. She said she did not enjoy the sexual acts but believed that was the only way to stop him from beating her.

Afterward, Heather either fell asleep or passed out, and awoke the next morning. She told Appellant she needed to leave so she could get rent money from a local church, but instead she went to a local establishment and contacted a local women's shelter, which contacted the police.

The police took Heather to the emergency room where a sexual assault nurse examiner (SANE) performed a physical examination. Heather had significant bruising, swelling, and scratches to her face, neck, and arms. She also had a broken jaw, a broken nose, and several broken ribs. At trial, the SANE nurse testified to the injuries Heather sustained and stated that there was evidence of sexual intercourse, although she could not determine if it was consensual or nonconsensual.

The jury was instructed on one count each of first-degree rape, first-degree sodomy, first-degree sexual assault, second-degree assault, fourth-degree assault, first-degree sexual abuse, first-degree wanton endangerment, second-degree wanton endangerment, first-degree unlawful imprisonment, and violation of a protective order.

The jury convicted Appellant of first-degree rape, fourth-degree assault, first-degree unlawful imprisonment, and violating a protective order. The jury acquitted Appellant of second-degree assault but was unable to reach a verdict as to first-degree sodomy, first-degree sexual abuse, first-degree wanton endangerment, or second-degree wanton endangerment. The court declared a mistrial as to these counts.

The jury found Appellant to be a PFO and sentenced him to 20 years for first-degree rape, enhanced to 25 years for PFO; 5 years for first-degree unlawful imprisonment, enhanced to 10 years for PFO; 12 months for fourth-degree assault; and 12 months for violation of emergency protective order, with all felony sentences to run consecutively for a total of 35 years. The court accepted the jury's sentencing and entered a judgment accordingly.

Appellant now challenges his conviction and sentence before this Court as a matter of right. Ky. Const. § 110(2)(b).

## II. Analysis

Appellant raises numerous arguments on appeal. First, he claims the trial court erred when it did not grant directed verdicts on three of his charges despite the lack of evidence of forcible compulsion. Second, he argues there was a *Brady* violation when the Commonwealth failed to disclose exculpatory evidence. Third, he alleges that the trial court erred by admitting an unredacted copy of Heather's medical records, which contained prejudicial hearsay and violated the Confrontation Clause. Finally, Appellant argues that the trial court erred when it allowed a redacted version of his statement to the detective into evidence, and allowed the detective to bolster the victim's testimony.

### A. Directed Verdict Motion

■ At trial, Appellant requested a directed verdict for first-degree rape, first-degree sexual abuse, and first-degree sodomy charges, arguing that the prosecution had not satisfied the forcible compulsion element. Appellant did not request an instruction on lesser-included offenses.

Before turning to the merits of Appellant's claim, the Court must first address the Commonwealth's contention that the issue is moot as to two of the counts, first-degree sexual abuse and first-degree sodomy. These counts were the subject of the court's mistrial declaration, as the jury could not reach a verdict on them. The Commonwealth argues that any claim related to these charges is moot because they were dismissed without prejudice after the trial judge declared a mistrial as to them.

This Court agrees. Because these charges were dismissed without prejudice, the Appellant's claim as to them is moot or at least is not justiciable. The charges are not currently pending, and there is no final judgment resolving them. Any review of them would necessarily be interlocutory in character, at the very least, which is not allowed by our rules. That Appellant can be re-indicted and tried on the charges in the future does not change this analysis. *Cf. Richardson v. United States,* 468 U.S. 317, 323, 104 S.Ct. 3081, 82 L.Ed.2d 242 (1984) (holding that a defendant may not claim a double jeopardy violation to bar retrial of mistried charges based on government's alleged failure to offer sufficient evidence of charges at first trial). Thus, this Court does not address the merits of Appellant's claim as to the dismissed first-degree sexual abuse and first-degree sodomy charges.

■ The other charge, first-degree rape, resulted in a conviction and presents a live controversy for this Court to resolve. Specifically, Appellant claims that the Commonwealth failed to prove the forcible-compulsion element of first-degree rape.

Forcible compulsion is "physical force or threat of physical force, express or implied, which places a person in fear of immediate death, physical injury to self or another person, fear of the immediate kidnap of self or another person, or fear of any offense under [KRS Chapter 510]." KRS 510.010(2). Physical resistance by the victim is not necessary. *Id.*

■ A trial court deciding a directed verdict motion "must draw all fair and reasonable inferences from the evidence in favor of the Commonwealth." *Commonwealth v. Benham,* 816 S.W.2d 186, 187 (Ky.1991). "If the evidence is sufficient to induce a reasonable juror to believe beyond a reasonable doubt that the defendant is guilty, a directed verdict should not be given." *Id.* "On appellate review, the test of a directed verdict is, if under the evidence as a whole, it would be clearly unreasonable for a jury to find guilt, only then the defendant is entitled to a directed verdict of acquittal." *Id.*

Appellant contends the Commonwealth failed to prove forcible compulsion because it only offered evidence of physical violence followed by sex without any proof that the violence was "a means to secure sexual intercourse, not just as a means to cause physical harm." In making this claim, he notes the lack of proof that he initiated the sexual contact or that he threatened Heather as a means of starting sex. He also notes Heather's testimony that she thought sex would be a way to calm him down. While this is one view of the evidence, it is not the only one.

When viewed in a light most favorable to the Commonwealth, this Court concludes that a reasonable jury could find forcible compulsion from this evidence. Heather

testified that she had been beaten for several hours before engaging in sexual activities with Appellant and that she believed she had to engage in sexual acts to prevent further beatings. Heather repeatedly asked if she could leave or if Appellant would leave, but he would not allow either. Heather testified that she did not want to have sexual intercourse with Appellant but believed it would be better than more beatings. At the very least, this established Heather's subjective view that she had been threatened to engage in sex, which is sufficient to prove forcible compulsion. *Salsman v. Commonwealth*, 565 S.W.2d 638, 641 (Ky.App.1978) ("In determining whether the prosecutrix submitted to Salsman because of an implied threat which placed her in fear of immediate death or physical injury, a subjective rather than objective standard must be applied.").

Moreover, the evidence also shows Appellant's state of mind. After several hours of committing physical violence against Heather, Appellant took a short break, after which he turned to her with a visible erection. He then began touching her face and kissing her. A jury could reasonably—and easily—conclude that this behavior presented a choice between engaging in sexual conduct or suffering further violence.

Appellant argues that this Court should clarify the element of forcible compulsion for rape by holding that the defendant must have used physical force or threatened physical force specifically to obtain sexual intercourse or sexual contact. This is certainly a reasonable reading of the statute, especially in light of the commentary to the 1974 version of the statute, which states:

The term also includes a threat, express or implied, . . . placing a person in fear of immediate death or physical injury to himself or to another person or in fear that he or another person will be immediately kidnapped. The threat must be communicated and *it must be the cause of the submission*. The definition does not require that the victim's fear be "reasonable."

KRS 510.010 Kentucky Crime Commission/LRC Cmt. (1974) (emphasis added).[1] But clarification is not necessary, because this conditional nexus between the violence (or threat of violence) and sex was shown by the evidence in this case. When viewing the totality of the circumstances, which included the Appellant beating Heather for several hours and then turning on her with an erection and touching her, a reasonable jury could infer that he implied a threat of further violence in order to accomplish sexual activities and that Heather submitted to his implicit sexual advance to avoid further violence. Heather testified that she believed Appellant would kill her and that he beat her for several hours. The Appellant's actions gave Heather reason to believe that if she did not have sexual intercourse with him he would continue to beat her. The evidence, at least when viewed in a light favorable to the Commonwealth, thus established that Appellant used physical violence as a means to secure sexual intercourse, not just as a means to cause physical harm.

Nevertheless, Appellant cites several cases, *Salsman v. Commonwealth*, 565 S.W.2d 638 (Ky.App.1978); *Yarnell v. Commonwealth*, 833 S.W.2d 834 (Ky.1992); *Miller v. Commonwealth*, 77 S.W.3d 566 (Ky.2002), that he claims support his argument that there was no forcible compul-

---

1. The omission from this quotation is language requiring that the threat overcome earnest resistance. Such a requirement has been expressly removed from the statute.

sion.[2] Having reviewed these cases, this Court disagrees.

In *Salsman*, testimony from the victim that she "feared [the defendant] would hurt her" if she did not have sex with him was deemed sufficient to meet the forcible compulsion element. *Salsman*, 565 S.W.2d at 640. Appellant contends that this element was only established in *Salsman* because the defendant requested sex with the victim and the victim said no, and the defendant then grabbed the victim, removed her clothes, and engaged in sexual activity. *Id.* First, *Salsman* is not binding on this Court, having been rendered by the Court of Appeals. Moreover, the Appellant misreads the case, as the victim's repeatedly saying "no" was not the key to establishing forcible compulsion. As the court noted, "[i]n determining whether the prosecutrix submitted to forcible compulsion, the jury was entitled to consider a number of factors." *Id.* at 641. The court emphasized that the key was whether the victim subjectively feared her assailant. *Id.* Additionally, *Salsman* has limited persuasiveness because it was decided in the era when a victim had to have earnestly resisted and the defendant had to overcome that resistance.

This case fits even within the *Salsman* framework. Although Appellant did not ask Heather to have sex with him, after he had been beating her for several hours, Heather noticed he had an erection and believed he wanted to have sex. Appellant's display of obvious sexual arousal combined with his beginning to kiss her was tantamount to a request for sex. Heather testified that she believed if she did not engage in sex that he would continue to beat her. She also testified to her

fear. "Taking into consideration all of the circumstances, the jury could believe beyond a reasonable doubt that the prosecutrix was terror-stricken at the time she submitted to [the defendant]." *Id.* at 642. That is enough to prove forcible compulsion.

In *Yarnell*, this Court found sufficient evidence of forcible compulsion where, over a period of time, the victims were subjected to constant emotional, verbal, and physical duress by the defendant. 833 S.W.2d at 836–37. The victims testified that they engaged in deviate sexual behavior with the defendant because of their fear of what he might do to them or to their mother. *Id.* at 837.

Appellant argues that the facts in his case do not meet forcible compulsion under *Yarnell* because they only refer to a single night of physical abuse and sexual activity. Again, this Court disagrees. Forcible compulsion is met if there is violence or a threat that causes fear of physical injury. KRS 510.010(2). Heather testified that she was afraid Appellant was going to beat her so badly that he would kill her. That this occurred in a single night, rather than over a period of time, does not change the fact that a threat could be inferred from the Appellant's abuse.

Finally, in *Miller*, the victim did not testify that the defendant used physical force, threatened to harm her if she refused his sexual advances, or submitted to sexual activity out of fear of the defendant. *Miller*, 77 S.W.3d at 575. Based on these facts, this Court found there was no forcible compulsion. *Id.*

Appellant contends the same occurred in this case, stating that because Heather

---

**2.** Appellant also cites *Van Dyke v. Commonwealth*, 581 S.W.2d 563, 565 (Ky.1979), but that case is completely inapplicable, since it did not present the question whether forcible compulsion was proven, but whether the forcible compulsion necessarily includes serious physical injury, which elevates first-degree rape to a Class A felony.

engaged in sexual activity to calm him down there was no forcible compulsion. Again, this Court disagrees. Heather testified that she was afraid of Appellant, that he beat her, and that she had sex with him to stop him from beating her—all things that were absent in *Miller*. A jury could reasonably conclude from this proof that Heather was compelled by force or threat of force to submit to sex with Appellant, which satisfies the requirements of forcible compulsion.

## B. Alleged Exculpatory Evidence

■ After trial, Appellant filed a motion for judgment notwithstanding the verdict and a motion for a new trial arguing, among other things, a due process violation under *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). Appellant contends that during the investigation before trial, Heather told the prosecutors, victims' advocates, and the detectives that she was not raped and that she started sex with Appellant, which he claims differed from the statements disclosed to the defense and the trial testimony. Appellant claims that the statements made during the investigation would be exculpatory under *Brady* and thus subject to disclosure by the prosecution. Appellant also contends that had the jury known Heather started sexual activities it may have returned a different verdict.

■ In *Brady*, the U.S. Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Id.* at 87, 83 S.Ct. 1194. "Evidence favorable to the accused" includes impeachment evidence as well as directly exculpatory evidence. *See United States v. Bagley*, 473 U.S. 667, 676, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985) ("Impeachment evi-

dence ... as well as exculpatory evidence, falls within the *Brady* rule. Such evidence is 'evidence favorable to an accused,' so that, if disclosed and used effectively, it may make the difference between conviction and acquittal." (citations omitted)). Whether a *Brady* violation occurred is reviewed de novo. *Commonwealth v. Bussell*, 226 S.W.3d 96, 100 (Ky.2007).

In a post-trial motion, Appellant's counsel claimed that Heather approached him after trial and said that she was not a rape victim, that she had initiated the sexual conduct, and that Appellant had not forced or compelled her to engage in sex. She also stated that she had told the same thing to the prosecutor and police during the investigation.

At a hearing on the motion, the prosecutor claimed that Heather had never used the word "initiate" to describe her role in the sexual conduct with Appellant and that the victim's characterization was not controlling. The prosecutor also stated that Heather had been uncomfortable describing what happened as rape, but that her story had always been consistent.

The trial court also heard testimony from Heather. Appellant's counsel questioned her first. Heather stated that after seeing reports on the news about the incident and the rape charge, she thought, "What have I done? ... I never meant for this to go that far, this big, but it did." She also stated that at first, she could not "see" that there had been a rape and was instead more concerned with the assault. She later said:

> Did I ever say I was not raped? No. But I looked at everybody and said, "Rape? How? What?" And now I know I did what I had to do to get through that night. I didn't know how many I could take up side my head before it was the last one.

When asked if she initiated sex, she said, "I said it on the stand. I did what I had to do to get through that night." When asked again, "I told everybody involved that I did what I had to do to calm him down." Repeatedly, she said she told "everybody" that she wasn't raped, wasn't a rape victim, but that she didn't want to have sex that night and had only done what she "had to do to get through that night." When asked again if she started the sex, she responded: "I started it to get through that night. If that's initiating, then yeah, I initiated it. But I did what I had to do to calm him down and no more hitting on me."

When asked the first time she made such a comment to a detective or prosecutor, she answered, "To Ann [the detective] at the hospital, to Erin [the prosecutor] the first time I met her, and you [the defense counsel] the first time I talked to you. And the judge every time I come in this courtroom." When asked whether she had told a victim's advocate, she said she told several of them the whole story and, "I have told everybody I do not think this is rape. I did what I had to do to get through that night, because I thought I was going to die." When asked what the response of people was when she said she initiated sex that night, she answered "They just asked me, 'Heather, did you want to have sex with Joe?' No, I didn't want to have sex. I did whatever I had to do. But I knew having sex with Joe was a whole lot less painful than taking any more licks up side my head." When asked whether she'd had a conversation just before trial, she said yes; she had "a hundred conversations with these people and it's the same way all the way through." In response to a follow-up question about why she said she wasn't a rape victim, she said, "I never said I'm not a rape victim. I said that I don't want to accept the fact that this is about rape or that I have to accept

being that victim. I've already accepted that I'm a domestic violence victim and that's enough. For me." When pressed further, she said:

> I know again I've said the same thing from the day at the hospital to trial to here to anywhere else: I did what I had to do. If it meant me flipping the game on him and making him calm down, I did it. If it led to rape, that's not my fault. I didn't sit there and think that shit out. I didn't have time. I just did what I had to do to get through there in that night.

When asked whether she had told the defense counsel after trial that she didn't feel like she was a rape victim and that she had started sex, she admitted she had said that, then followed up with "I just said it, McGinnis [defense counsel]. I do not feel like I am a rape victim. I'm not going to accept that. But the facts, the law, the reason we're here, I can't help that. That's not my fault." Then she said:

> Did I initiate the sex? Yeah. Did I do whatever I had to do to calm him down, to get through that night? Yes. But did I want to have sex with Joe? No! I was wore out. I'd done been beat for seven hours straight, continuously up side my head. No, I didn't want to have sex with him. But I did it.

When defense counsel then said, "What I'm trying to do here is not—", she interrupted him, saying, "You're trying to trip me up, and I've said the same damn thing over and over and over a hundred times. Did I want to have sex with him? No. Did I start it? Yes." When asked if the police or prosecution were aware, "They did their jobs. The only thing they did was try to protect me from day one to now. And make me understand how we got here. I understand how we got here. I just don't like it." She also said, "I'm sorry he's in here on rape. I'm sorry he got convicted. That's not my fault."

On cross-examination, she said the police, victims' advocates, and prosecution never told her to change her story about what happened, to say things that didn't happen, or to lie.

On redirect, she said:

Bottom line, did I start the sex? Did I do what I had to do to get out of that room alive? Yeah, I did. But it wasn't willingly. Because I knew if I said no once he got started, that's another lick up side my head. I did not know how many more I could take, so I did whatever I had to do. If it meant flipping it on him and he ends up here like this, not my fault. But I stand by the fact that I did not want to have sex with Joe. I didn't start it planning. I did what I had to do.

She characterized what happened that night in slightly different terms in the transcripts of police interviews that were disclosed to the defense prior to trial. In a short interview on January 17, right after the incident, she described the beating she had received. She then stated, "He gave me a rag and let me wipe all the blood and stuff off me. Then he came over and undid my pants, and I knew if I was to say no, Joe, I don't want to do this or anything like that I was gonna keep continuing being beaten, hitting, and licked, so I didn't say no, I just let him do what he wanted to do." When asked what he did, she said,

We had sex ... he used his fingers and then he stuck it in me. I mean it was like our normal, you know, like we would always have sex but it was one of them now, he's starting to feel guilty because he's looking at my face and I guess that was his way of saying he was sorry. But I knew if I would a said anything,

Joe, I don't want to do this, you know he wasn't gonna let me leave. [...] So I just let him do what he had to do.[3]

Later in the interview, when asked the last time she had consensual sex with Appellant, she said, "Uh, the ... well, I mean I allowed all this to go down because I knew if I didn't ... if I said no, it was gonna be physical."

In a lengthier interview on January 28, she described the incident as follows:

And uh, I'm prayin', God, please let the anger stop. Please let this, let him stop bein' so angry. And just out of nowhere I turned around and he's standing' in front of me and he, he had my hands, my face in his hands. And he's like, Heather, I love you more than anything in this world but I could kill you right now. You betrayed me [....] Uhm, just out of nowhere, he's just standin' there in front of me and he got a hard-on. He's just straight ... bing ... and I can see in his eyes. When he's tellin' me, I love you more than anything in this world, I could see his eyes changing. He's softening up. I was like, thank you, God. And I'm sittin' here, I've got blood comin' out of my eye, blood out of my nose and my lip's busted, and he's wantin' to have sex. Well the door's locked, he's already told me so. Heather, you bet ... no, he kept sayin', you better scream and hope somebody in this building hears you and calls the police 'cause that the only way you're getting' out of here alive. And the door is locked and he said before, and I'm not openin' that door willingly, they're gonna have to tear it down. [...] Busted both my eyes and broke my jaw. And uh, then he, he ... like I said, he got a

---

**3.** The interview transcripts in the record include ellipses throughout the text, presumably to indicate pauses. Ellipses that have been added to indicate an omission are enclosed in brackets to differentiate them.

hard-on, his eyes were softenin', and he's trying to kiss me on the lips and I knew I, if I said no, if I didn't go along with, just let the day go, just play along, whatever, it was gonna keep goin' on so I went along with it. And then he had sex with me then . . .

When asked later in the interview about oral sex, she said:

Did he hold my head and make me do it? No, but I knew . . . he had already done me. [ . . . ] And so he had already did me and he had, it was kinda like, okay, your turn. I'm sittin' there, mouth busted open, barely could see him . . . and I went along with whatever.

Later in the interview, she said:

I was mad, too, because I'm thinkin', how could you sit there and punch me the way you are and then turn around and tell me you love me and have a hard-on? It made me realize how sick he really is. But I just had to do it. I had to go . . . if he wasn't gonna let me go to the bathroom when I needed to pee, I knew he wasn't gonna take . . . accept no for anything. So I just laid there . . . do it . . . get it over with.

The trial court reviewed Heather's statement to the police and testimony given at both the trial and the hearing and found them to be consistent. The court stated that "[t]he only inconsistency is Defendant's effort to place a literal, isolated slant on semantics; i.e., she said she was not a victim of rape; she initiated sexual conduct with the Defendant; Defendant did not force her to have sexual conduct."

This Court agrees. It appears that throughout her statements before trial, Heather stated that she "went along" with sex to avoid further beating and to survive the rest of the night. This is not substantially different than "starting" or "initiating" sex to avoid further beating and to survive the rest of the night, which she

later claimed she told the police and prosecution. The trial court was correct that claiming only one of these is exculpatory is a "slant on semantics" or, put another way, a distinction without a difference.

Moreover, it is not even clear that Heather actually told the police or prosecution that she "started" sex. Her post-trial characterization of "starting" the sex, rather than just "going along," may have only come out after the conviction. Indeed, it appears that Heather thought the characterizations were essentially the same thing, with her more forceful characterization only coming about after Appellant was convicted of the very serious offense of rape, which had not been her intention when she went to the police and cooperated with the prosecution.

The only real difference between the statements disclosed to the defense and what Heather later claimed she told the police and the prosecution is that the former did not include her characterization of the sexual contact as not rape. But the failure to disclose such a characterization, even assuming that it occurred, did not violate *Brady*. A victim's legal conclusion about an assailant's behavior simply is not exculpatory, especially in a case like this one where the victim continued not to want to think of herself as a rape victim and appeared not to want the assailant convicted of such a serious offense.

First, it is not clear that Heather actually made the supposedly exculpatory statements that were not turned over to the defense. Appellant never established that such statements were made to the police or the prosecution. Second, even assuming the statements were made, the simple fact of the matter is that the statements turned over prior to trial were substantially the same as the other alleged statements. The statement disclosed to

defense counsel, the testimony offered at trial and at the post-trial hearing, and the statements that Appellant's counsel claims Heather actually made were all substantially the same. The pre-trial statements offered a sufficient basis for the defense to pursue a consent defense. That the victim was uncomfortable with the label "rape" and protested after the fact that she actually started sex (as opposed to just going along with it) does not change this. Such claims were implicit in the statements that were turned over to the defense. There was no due process violation in this case.

## C. Prejudicial Hearsay and Violation of Confrontation Clause

Appellant also argues that the medical records entered into evidence contained prejudicial hearsay and should have been redacted. The records in question were the registration forms, intake documents filled out when Heather was taken to the hospital, and medical records of her visit. The registration form includes several references to "rape victim" and "sexual assault." For example, in a box with insurance information, "RAPE VICT" is listed along with "JEFFERSON" as the name of the insurance carriers, presumably because the cost of examinations related to rape allegations are covered by the county. A box labeled "Chief Complaint" states, "SEXUAL ASSAULT 2000 LAST PM." That same text is listed on another form for physician orders in a box titled "CC," which presumably refers to "chief complaint." That same form, in a section titled "Impression," includes the phrase "sexual assault" and states the reason for several tests being performed as "assault." On another form, the "reason for admission" is listed in part as "sexual assault + rape." The records also include a handwritten account of the events of the assault and rape, presumably written by the SANE nurse, consisting primarily of what appear to be direct quotations from Heather Frazier describing the assault and some statements by the assailant, as recounted by Heather that he would kill her. Appellant is not identified by name in these statements.

Appellant contends these statements were prejudicial hearsay and violated the rules of evidence. Appellant also argues this evidence was a violation of the Confrontation Clause.

The Commonwealth initially mentioned these records during the testimony of the SANE nurse with questions about diagnoses made by other medical personnel and recorded in the records. The trial court sustained a defense objection and stated that the information would need to come in through another witness. No other witness was called on the subject, and the Commonwealth rested its case. The defense called no witnesses. The next morning, the Commonwealth asked to re-open its case to introduce certified copies of the records, claiming it had forgotten to introduce them and Appellant would not be prejudiced. Appellant objected, claiming that it was not an oversight, that the prosecution had made a conscious decision not to call anyone after having tried to get the documents in through the SANE nurse, and that the records were not admissible.

While Appellant objected to the introduction of the records, he did not do so for the reasons now claimed. He offered up only a generic claim that they were inadmissible. As such, it is somewhat questionable whether the claimed error was preserved for review, which would limit review only for palpable error. *See* RCr 10.26. But given the way the documents were introduced, at the last minute and in the course of a limited re-opening of the Commonwealth's case, this Court will pre-

sume the claim of error is preserved by the general objection and address its merits.

### 1. Hearsay

So long as the authentication requirements are met, medical records are normally admissible as business records under KRE 803(6). *See Matthews v. Commonwealth,* 163 S.W.3d 11, 26 (Ky.2005) ("Medical records like those in this case generally fall under the business records hearsay exception embodied in KRE 803(6). . . ."); Robert G. Lawson, *The Kentucky Evidence Law Handbook* § 8.65[10], at 693 (4th ed. 2003) ("The pre-Rules law defined the business records exception to include coverage of medical records, and . . . KRE 803(6) does the same." (footnote omitted)). But the exception only applies to matters that the person making the record had personal knowledge of. Often, medical records may contain a second level of hearsay—for example, statements made by the victim who is being examined—that is not included in the business records exception. Such statements must be admitted under a different exception.

Many of these statements, specifically the portions describing the injuries sustained and their source, are admissible under KRE 803(4) as "statements for the purpose of medical diagnosis and treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to treatment or diagnosis."

■ Other statements, however, are more problematic. For example, the statements made by Appellant to Heather, who then repeated them to the SANE nurse, who recorded them in the medical records, were another (triple) level of hearsay. Heather's repetition of these statements was not necessary or pertinent to her diagnosis or treatment, nor did it describe her medical history or the source or character of the injuries. No other hearsay exception covers these statements.[4]

■ Likewise, the conclusory statements that Heather had been raped and subjected to sexual assault were also inadmissible. KRE 803(4) only covers statements by the patient, so any statements by the medical personnel would have to be admitted under another rule. While the hearsay statements by medical personnel might not be barred by the hearsay rule, because they fall under the business records exception, the fact that they are merely opinions or conclusions about what happened would make them inadmissible. *See Hall v. Commonwealth,* 862 S.W.2d 321, 322–23 (Ky.1993) ("In the case of a psychologist or social worker, 'testimony . . . of whether sexual abuse has occurred . . .' is impermissible, as these experts are simply not 'qualified to express an opinion' that a person has been sexually abused. . . . Accordingly, it was improper for Ms. Ballou to give her opinion that the children had been sexually abused." (citation omitted)).

■ The question, then, is whether the improperly admitted statements were harmless error. *See* RCr 9.24 (requiring court to ignore any error "unless it appears to the court that the denial of such relief would be inconsistent with substantial justice" or "affect[s] the substantial rights of the parties"). The test under this rule "is not simply 'whether there was enough [evidence] to support the result, apart from the phase affected by the error.

---

4. If Heather had instead testified directly as to Appellant's statements, they would be admissible as admissions by a party under KRE 801A(b).

It is rather, even so, whether the error itself had substantial influence. If so, or if one is left in grave doubt, the conviction cannot stand.'" *Winstead v. Commonwealth,* 283 S.W.3d 678, 689 (Ky.2009) (quoting *Kotteakos v. United States,* 328 U.S. 750, 765, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946)). The jury heard extensive testimony from Heather herself about the brutal beating she received over the course of several hours and her ultimate submission to repeated sexual contact with Appellant. The jury also heard from the SANE nurse who examined Heather after the incident. It is unlikely that the statements in the medical records had "substantial influence" on the jury. The error was not prejudicial, and therefore this Court concludes that it was harmless.

### 2. Confrontation Clause

■ Appellant also argues that entering the unredacted medical records violated his rights to confront and cross-examine the medical personnel who evaluated Heather and those who prepared the documents. In *Crawford v. Washington,* 541 U.S. 36, 53–54, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), the Confrontation Clause was read to preclude out-of-court statements of a witness who was unavailable to testify if those statements were testimonial, unless the accused had the opportunity to cross-examine the witness.

This Court has held that "statements taken from [a rape victim] during her interview with the SANE nurse were testimonial in nature." *Hartsfield v. Commonwealth,* 277 S.W.3d 239, 245 (Ky.2009). This is because SANE nurses "act[ ] in cooperation with or for the police," follow a "protocol ... requir[ing] them to act upon request of a peace officer or prosecuting attorney," "serve[ ] two roles: providing medical treatment and gathering evidence," "act to supplement law enforcement by eliciting evidence of past offenses with an eye toward future criminal prosecution," and are "active participant[s] in the formal criminal investigation." *Id.* at 244. Ultimately, "their function of evidence gathering, combined with their close relationships with law enforcement, renders SANE nurses' interviews the functional equivalent of police questioning." *Id.*

But Heather Frazier was available and actually testified in this case. She was cross-examined—and therefore *confronted*—by the defense. Thus, admission of any statements made by her to the SANE nurse did not violate *Crawford,* since a confrontation violation can only occur if the defendant is unable to cross-examine the declarant.

Other statements made to other medical personnel included in the records were not formal or on behalf of the police. Their purpose was not evidence-gathering or preparation for a prosecution. Thus, they were not testimonial and not subject to the Confrontation Clause.

### D. Miscellaneous Hearsay

Appellant complains both that the trial court prevented him from introducing the exculpatory statements he made to the police in violation of the rule of completeness, and that the prosecution was allowed to bolster Heather's testimony with prior consistent statements. Though Appellant addressed both issues together in his brief, they need to be addressed separately.

### 1. Remainder of Appellant's Statement

■ While investigating the crimes, Detective Ann Cohen interviewed Appellant. Detective Cohen did not record the conversation, though she took notes about its content. She later recounted the interview in a report or "investigative letter,"

which was produced for the defense in discovery.

In the interview, Appellant admitted to hitting and kicking Heather. He also admitted he had been angry with her because she had gotten him put in jail earlier in the month, had allegedly given him a sexually transmitted disease and had been with another man, as evidenced by a letter he found. When asked why he had been on the run and not turned himself in, he replied, "With charges like that, are you kidding?" Also in the interview, he denied having raped Heather and claimed they had "made love several times" the night of the offenses.

Before trial began, the Commonwealth moved the court to bar defense counsel from asking the detective about the "self-serving" portions of the interview. Defense counsel argued that all the statements should be admitted and the prosecution was simply "cherry picking," though he never mentioned the rule of completeness. The trial court granted the motion.

On direct examination, the detective repeated some of Appellant's inculpatory statements, which were admitted under KRE 801A(b). Specifically, she repeated Appellant's admissions that he had hit Heather and his explanation for why he had not turned himself in and had been on the run for several months. The report that described the interview was not itself admitted into evidence. Rather, the detective was questioned directly about the statements.

The statements Appellant sought to introduce were hearsay and did not fall under a hearsay exception. While KRE 801A(b) had been used to admit the statements introduced by the Commonwealth, Appellant could not use the same exception. It requires that "the statement [be] offered against a party." KRE 801A(b). No other hearsay exception covered the statements.

Instead, Appellant now argues that the other statements should have been admitted under the rule of completeness, which is codified explicitly in KRE 106 for written and recorded statements[5] and indirectly in KRE 611 for other types of statements.[6] Regardless of the source of the

**5.** KRE 106 states: "When a writing or recorded statement or part thereof is introduced by a party, an adverse party may require the introduction at that time of any other part or any other writing or recorded statement which ought in fairness to be considered contemporaneously with it." The rule applies specifically to written or recorded statements, which is why some authorities claim it "has no application to oral statements" made or repeated in court testimony. Robert G. Lawson, *The Kentucky Evidence Law Handbook* § 1.20[3][d], at 70 (4th ed.2003) (footnotes omitted); *see also* Richard H. Underwood, *Kentucky Evidence 2005–2006 Courtroom Manual* 35 (2005) ("The Rule is limited to writings and recording and does not expressly include conversations or other evidence."); Joseph M. McLauglin et al., *Weinstein's Federal Evidence* § 106.02[3] (2d ed. 2009) ("Rule 106 is limited to writings and recorded statements. Reports of oral conversations and other forms of testimonial proof that are not

written or recorded are not covered by Rule 106, because of the inevitable problems surrounding the question whether the additional oral statements were in fact made."). *But see, e.g., Rodgers v. Commonwealth*, 285 S.W.3d 740, 748 (Ky.2009) (applying KRE 106 to testimony about recorded statements where the recording is not directly admitted into evidence).

**6.** KRE 611 requires trial courts to "exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence so as to ... [m]ake the interrogation and presentation effective for the ascertainment of the truth; [and] ... [a]void needless consumption of time...." KRE 611(a)(1). It is generally read as including a rule of completeness for non-written and non-recorded statements—a gap left by KRE 106. *See* Robert G. Lawson, *The Kentucky Evidence Law Handbook* § 1.20[3][d], at 70–71 (4th ed.2003)

doctrine, it is currently applied in the same way to both written or recorded out-of-court statements and testimony about out-of-court statements.

 The basic rule is simple: "a party purporting to invoke [the rule of completeness] for the admission of otherwise inadmissible hearsay statements may only do so to the extent that an opposing party's introduction of an incomplete out-of-court statement would render the statement misleading or alter its perceived meaning." *Schrimsher v. Commonwealth*, 190 S.W.3d 318, 330–31 (Ky.2006) (footnote omitted). The issue, then, is always "whether the meaning of the included portion is altered by the excluded portion." *Id.* at 331 (quoting *Young v. Commonwealth*, 50 S.W.3d 148, 169 (Ky.2001)). But this places a limit on what may be admitted under the rule. *See id.* ("Contrary to Appellant's position, KRE 106 does not 'open the door' for introduction of the entire statement or make other portions thereof admissible for any reason once an opposing party has introduced a portion of it." (quoting *Gabow v. Commonwealth*, 34 S.W.3d 63, 69 n. 2 (Ky.2000))). This limit even applies where a defendant has confessed to a crime but also makes exculpatory statements:

> The completeness doctrine is based upon the notion of fairness—namely, whether the meaning of the included portion is altered by the excluded portion. The objective of that doctrine is to prevent a misleading impression as a result of an incomplete reproduction of a statement. *This does not mean that by introducing a portion of a defendant's confession in which the defendant admits the commis-sion of the criminal offense, the Commonwealth opens the door for the defendant to use the remainder of that out-of-court statement for the purpose of asserting a defense without subjecting it to cross-examination.*

*Id.* (quoting *Gabow v. Commonwealth*, 34 S.W.3d 63, 69 n. 2 (Ky.2000)).

Yet that is precisely what Appellant sought to do here. Appellant made inculpatory statements in his interview to the police in which he admitted to beating Heather Frazier. At trial, he sought to have his self-serving, exculpatory statements admitted, allegedly to provide context for the other statements. But the meaning of the statements in which he admitted the beating and evading police was not distorted by exclusion of the other statements. Appellant argues that the exclusion could have led the jury to believe he had admitted to the rape, but no such statement was ever introduced. While the rule of completeness is needed to guarantee that admitted statements are fully understandable and clear, it is not needed to explain hypothetical statements never introduced at trial. Appellant's admissions to the beating and evading police simply are not related to his claims that he did not commit a rape. The trial court, therefore, did not err in excluding the statements.

### 2. Prior Consistent Statement

 Throughout the trial, Appellant noted inconsistencies in the victim's story between the two interviews she gave to police, and between those interviews and what she told other people. Specifically,

---

(noting that "additional parts of such statements would be admissible under general evidence doctrine if needed to prevent distortion or misleading impressions" and citing the federal courts' use of Rule 611); Joseph M. McLauglin et al., *Weinstein's Federal Evidence* § 106.02[3] (2d ed. 2009) ("However, the trial court does have an essentially equivalent control over testimonial proof, as part of the judge's general power to control the mode and order of interrogating and presenting evidence." (citing Fed.R.Evid. 611)).

he asked the victim herself and the police detective who interviewed her about inconsistencies. On re-direct of the detective, the prosecutor asked whether the victim's story had changed with regard to whether Appellant had punched her, kicked her, raped her, or digitally penetrated her. The detective said there had been no contradiction. Appellant then objected, which the trial court overruled.

He now complains that the statements were inadmissible hearsay used only to bolster Heather's credibility. The Commonwealth argues that the statements were prior consistent statements under KRE 801A(a)(2).

To the extent that the statements were hearsay, or at least out-of-court statements, they were admissible.[7] The statements were offered solely to rebut Appellant's claim that the victim's story had changed, had been inconsistent, and had been shown to be partly false, all of which tended to show generally that she was a liar. In fact, the statements came in during redirect very shortly after the defense's cross-examination about that very subject. In this context, "the statement had 'some rebutting force beyond the mere fact that the witness has repeated on a prior occasion a statement consistent with his trial testimony.'" *Noel v. Commonwealth*, 76 S.W.3d 923, 929 (Ky.2002) (quoting *United States v. Ellis*, 121 F.3d 908, 920 (4th Cir.1997)).

In such a case, the statement is not admitted under KRE 801A(a)(2) as a prior consistent statement. Indeed, KRE 801A(a)(2) does not even address this scenario, as "[i]t is silent with respect to the propriety of using evidence of prior consis-

tent statements for other purposes (most notably for rehabilitation after impeachment that does not involve a claim of recent fabrication or improper influence motive)." Robert G. Lawson, *The Kentucky Evidence Law Handbook* § 8.10[3], at 581 (4th ed.2003). Instead, the statement is admitted as non-hearsay because it is offered not for the truth of the matter but "to rehabilitate ... credibility." *Engebretsen v. Fairchild Aircraft Corp.*, 21 F.3d 721, 730 (6th Cir.1994); *see also* Robert G. Lawson, *The Kentucky Evidence Law Handbook* § 8.10[3], at 583 (4th ed. 2003) ("In these situations, of course, the prior statement would have to be used for credibility and not substantive purposes (there being no applicable hearsay exception), and the opposing party would be entitled to a limiting instruction to that effect upon request.").

In this case, the statements were offered only to rehabilitate Heather's credibility, which had been attacked by the defense with claims that her story changed in the past and she had demonstrably lied. "The trial court has greater discretion to admit prior consistent statements to rehabilitate an impeached witness, by clarifying or explaining his prior statements alleged to be unreliable, than if the statements are offered for their truth under Rule 801(d)(1)(B) [the federal equivalent of KRE 801A(a)(2) ]." *Engebretsen*, 21 F.3d at 730. The trial court did not abuse its discretion in admitting the testimony.

Appellant also argues that these statements provided a further reason to admit his exculpatory statements from his interview with the detective. But whether Appellant made a given out-of-court state-

---

7. Pointing out a consistency is somewhat different than repeating a prior consistent statement. The detective did not actually repeat the statements, though they were implicitly included in the prosecutor's somewhat leading questions. Instead, the detective said the victim's statements about each action or event asked about had not changed between the two interviews.

ment has no bearing on whether his victim lied in the past or told inconsistent stories. Like "introducing a portion of a defendant's confession," introducing prior statements of a witness for rehabilitation purposes does not "open[ ] the door for the defendant to use the remainder of [his] out-of-court statement for the purpose of asserting a defense without subjecting it to cross-examination." *Schrimsher,* 190 S.W.3d at 331 (quoting *Gabow v. Commonwealth,* 34 S.W.3d 63, 69 n. 2 (Ky.2000)).

### III. Conclusion

For the foregoing reasons this Court affirms the judgment of Jefferson Circuit Court.

MINTON, C.J.; ABRAMSON, CUNNINGHAM and SCOTT, JJ., concur. SCHRODER, J., concurs in result only. VENTERS, J., concurs in result only by separate opinion.

VENTERS, J., concurring in result only.

I concur with the Majority's conclusion that all the elements of forcible rape were established with sufficient evidence to defeat a motion for a directed verdict. I write separately on that point to clarify a critical distinction relating to the evidence constituting rape, which I believe becomes somewhat blurred in the Majority's discussion of the *Brady* issue. In that discussion, the Majority says there is no substantial difference in whether Heather "went along" with sex to avoid further beating or she "started" or "initiated" the sexual activity to avoid additional injury. In the context of the *Brady* issue, and given the totality of Heather's post-trial statements, I agree.

However, in context of what constitutes the crime of rape under KRS Chapter 510, the two are very different. Heather's "going along" with, or submission without physical resistance to, Appellant's sexual advances to avoid further beating completely satisfies the element of forcible compulsion. Appellant's sexual advances in the midst of his brutal attack came with the implied threat that the violence would resume if she did not yield to his sexual desire. That is clearly rape under KRS Chapter 510. Since that is what the evidence shows happened here, the rape conviction stands. That is, however, a substantially different event than a hypothetical situation in which an assault victim is the one who "initiates" sexual activity with the assailant in order to divert his attention from the violent attack upon her. The hypothetical victim's brave determination to protect and defend herself by whatever desperate means she may have available does not convert the attacker into a rapist where the intent to engage in sexual intercourse did not originate with him and was accomplished without force. In that sense, there is a significant difference between a victim, "going along" with a sexual advance instigated by an assailant, and "initiating" sexual activity to distract an assailant who had not theretofore signaled a demand or request for sex.