# Supreme Court of Kentucky

2021-SC-0510-MR

WILLIAM KENNETH RIGGLE, SR.                                  APPELLANT

ON APPEAL FROM JEFFERSON CIRCUIT COURT
V.                    HONORABLE BRIAN C. EDWARDS, JUDGE
                            NO. 17-CR-002836-002

COMMONWEALTH OF KENTUCKY                                      APPELLEE

## ORDER

The Petition for Rehearing and Modification, filed by the Appellant, of the Opinion of the Court rendered December 14, 2023, is DENIED IN PART, and GRANTED IN PART.

The Court denies the Petition to the extent that it requests rehearing, but grants modification of the Opinion of the Court in part. The original Opinion of the Court, rendered on December 14, 2023, is modified as set forth in the attached modified Opinion of the Court. Said modification does not affect the holding of the original Opinion.

All sitting. All concur.

ENTERED: March 14, 2024.

_____
CHIEF JUSTICE

# Supreme Court of Kentucky

2021-SC-0510-MR

WILLILAM KENNETH RIGGLE, SR.                  APPELLANT

ON APPEAL FROM JEFFERSON CIRCUIT COURT
V.          HONORABLE BRIAN C. EDWARDS, JUDGE
NO. 17-CR-002836-002

COMMONWEALTH OF KENTUCKY                APPELLEE

**OPINION OF THE COURT BY JUSTICE KELLER**

**<u>AFFIRMING</u>**

After a jury trial in Jefferson Circuit Court, William Kenneth Riggle, Sr. ("Senior") was convicted of three counts of sodomy in the first degree, eight counts of sexual abuse in the first degree, and three counts of intimidating a participant in the legal process. The trial court imposed a sentence of seventy (70) years' imprisonment in conformity with the mandates of Kentucky Revised Statutes (KRS) 532.110(1)(c). Senior now appeals to this Court as a matter of right, KY. CONST. § 110(2)(b), and raises four allegations of error. We affirm the entirety of Senior's convictions.

## I.  FACTS AND PROCEDURAL HISTORY

Danielle, Angela, and Alyssa[1] are sisters who were placed in the custody of their aunt, Kathy Riggle, and her husband, Senior, in 2009. The girls' biological parents, Chrystal and Johnnie, struggled with drug abuse and could not appropriately care for their children. At the time they came into the Riggles' care, Danielle was five (5) years old, Angela was two (2) years old, and Alyssa was sixteen (16) months old. William Kenneth Riggle, Jr. ("Junior"), along with his five (5) younger siblings, also resided in the Riggle household. For the next eight (8) years, the three sisters stayed with the Riggles while their biological parents exercised supervised visitation.

In July 2017, Chrystal regained custody of the girls. In August 2017, all three girls reported to Chrystal that they had each been sexually abused by Senior and Junior. Chrystal took the three girls to the hospital where they underwent physical examinations and were interviewed by an investigator from Child Protective Services ("CPS"). Subsequently, Louisville Metro Police Department Detective Stacey Robey took over the investigation and arranged for each girl to speak individually with a forensic interviewer outside the presence of their parents.

Following further investigation, Senior was indicted on sixteen (16) felony counts, and Junior was indicted on fifty-six (56) felony counts and three (3)

---

[1] We use the same pseudonyms selected by the Commonwealth to protect the identities of the child victims in this case.

2

misdemeanor counts. These charges were the subject of a joint, multi-day jury trial.

At trial, each of the sisters testified that Senior and Junior began abusing them when they were each seven (7) or eight (8) years old. Danielle testified that Senior sexually assaulted her in numerous ways in various locations in the home. She described multiple times when she was instructed to perform oral sodomy on Senior, times when he performed oral sodomy on her, and testified that Senior rubbed her vagina with his hands and his penis. Danielle also testified she did not scream or reach out for help because Senior threatened her and her family.

Angela testified that when she was seven (7) years old, Senior "French kissed" her and made her stroke his penis. She also testified that Senior later instructed her to straddle him on his bed and rub her vagina against his penis. She recalled his penis "often" touched her mouth. Angela testified that when she was ten (10) years old, Senior put his penis in her mouth, and something came out of it which landed on the floor. Angela testified that Senior would make her kiss her sister Alyssa while Senior watched. Angela also testified that Senior made her swear on her little sister not to tell anyone about his abuse. She stated she believed that meant her sister would die if she broke her promise to remain quiet.

Alyssa testified that Senior forced her to place his penis in her mouth on more than one occasion. She stated "white stuff" came out each time. She also testified that Senior made her shower with him and wash his back and penis,

3

and that he would sometimes lay on top of her and rub his penis on her vagina. She testified Senior would sexually touch her sister Angela in similar ways and would often have them both in the room while he abused the other. Further, Alyssa testified that Senior threatened to hurt her parents with a "blue and gray gun" and that she believed her sister would die if she were to disclose the abuse.

The Commonwealth also presented testimony regarding uncharged sexual acts perpetrated by Senior against three other minor girls present in the Riggle household, K.W., M.W., and C.R.

Angela also testified at trial that while she was living with the Riggles she initially disclosed Senior's and Junior's abuse to her middle school counselor, Jennifer Morehous (Ms. Rosie). That fact is relevant because during her pre-trial investigation, Detective Robey was unable to confirm with anyone at Westport Middle School that Angela had disclosed any abuse to a counselor at that school.

At trial, Senior's defense was generally one of complete denial of any inappropriate acts and insistence that Chrystal had coached her daughters into fabricating their sexual abuse accusations. He utilized cross-examination to highlight the large number of people living in a relatively small home with creaky floors and the numerous occasions when sizeable gatherings of friends and relatives would occur at the house in an effort to imply that he had no opportunity to commit the acts of which he was accused.

4

At the close of the Commonwealth's case, the Commonwealth dismissed forty-three (43) counts of the indictment, including two (2) counts against Senior.[2] The jury deliberated less than ninety (90) minutes, and found Senior guilty on all counts. Following the sentencing phase, the jury recommended twenty-five-year sentences on the three sodomy counts to be served consecutively. It recommended five-year sentences on the three counts of intimidating a participant in a legal process and one of the sexual abuse charges against Danielle, and ten-year sentences on the remaining counts, all to run concurrently with one another and the previously described sentences for a total recommended aggregate sentence of seventy-five (75) years. The trial court sentenced Senior in accordance with the jury's recommendation but limited the aggregate total to the statutory maximum of seventy (70) years. KRS 532.110(1)(c). This appeal followed.[3] Further facts will be developed as necessary.

## II.    ANALYSIS

Senior alleges (1) the trial court erred when it admitted testimony from K.W. and M.W. detailing prior bad acts of sexual abuse committed by Senior,

---

[2] The remaining charges for Senior were as follows: Angela—one count of sodomy in the first degree, three counts of sexual abuse in the first degree, and one count of intimidating a participant in the legal process; Danielle—one count of sodomy in the first degree, four counts of sexual abuse in the first degree, and one count of intimidating a participant in the legal process; Alyssa—one count each of sodomy in the first degree, sexual abuse in the first degree, and intimidating a participant in the legal process.

[3] Junior has separately appealed from his convictions. *See William Kenneth Riggle, Jr. v. Commonwealth*, No. 2021-SC-0490-MR, 2023 WL 6372894 (Ky. Sept. 28, 2023).

(2) the trial court erred in admitting improper "bolstering" testimony from Angela's school counselor, (3) two of the trial court's jury instructions denied Senior his right to a unanimous verdict, and (4) the trial court erred in failing to direct a verdict of acquittal as to Counts 65 and 66. Because this Court discerns no reversible error, we affirm Senior's convictions in total.

### A. Testimony from K.W. and M.W. regarding Senior's prior bad acts was admissible under KRE 404(b).

Senior argues that the trial court erred when it admitted testimony from K.W. and M.W. regarding prior acts of sexual abuse and unwanted sexual touching in contravention of KRE 404(b). Because such evidence tended to prove that Senior was engaging in a common scheme or plan, we hold the admission of that evidence was proper under KRE 404(b).

Prior to trial, the Commonwealth, pursuant to KRE 404(c), filed notice that it intended to introduce testimony from Angela, Alyssa, and Danielle to establish that Senior's abuse began as kissing and touching of their breasts and buttocks, and progressed in severity. The Commonwealth also provided notice of its intent to introduce similar testimony regarding prior acts of inappropriate touching and kissing that Senior had aimed at K.W., M.W., and C.R. The Commonwealth asserted that these prior acts of abuse explained why Senior's victims did not actively resist the incidents alleged in the indictment. At an evidentiary hearing before the trial court, the Commonwealth argued that evidence of the prior instances of abuse tended to prove that Senior "groomed" his victims, making them more receptive to later sexual abuse. The trial court

6

ultimately reasoned the evidence tended to show a pattern of conduct, and admitted the testimony under KRE 404(b).

Trial courts must admit evidence under KRE 404(b) "cautiously, with an eye towards eliminating evidence which is relevant only as proof of an accused's propensity to commit a certain type of crime." *Bell v. Commonwealth*, 875 S.W.2d 882, 889 (Ky. 1994). In making its determination of admission under KRE 404(b), the trial court must consider whether the evidence is relevant, probative of the prior bad act, and whether its potential prejudice substantially outweighs any probative value. *Id.* We review the trial court's evidentiary rulings for an abuse of discretion. *Goodyear Tire & Rubber Co. v. Thompson*, 11 S.W.3d 575, 577 (Ky. 2000). "The test for abuse of discretion is whether the trial judge's decision was arbitrary, unreasonable, unfair, or unsupported by sound legal principles." *Commonwealth v. English*, 993 S.W.2d 941, 945 (Ky. 1999).

Evidence of other crimes, wrongs, or acts is generally inadmissible to prove a defendant's character or propensity to act in conformity therewith, but may be admissible "[i]f offered for some other purpose, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident[.]" KRE 404(b)(1). This list of "other purpose[s]" is "illustrative rather than exhaustive." *Rodriguez v. Commonwealth*, 107 S.W.3d 215, 219 (Ky. 2003) (quoting *Colwell v. Commonwealth*, 37 S.W.3d 721, 725 (Ky. 2000)). This Court has previously held that prior bad acts evidence is admissible under KRE 404(b) where that evidence tends to prove the Defendant

engaged in a "common scheme or plan." *Pendleton v. Commonwealth*, 685 S.W.2d 549, 552 (Ky. 1985). The admissible evidence of prior bad acts is said to be "part and parcel" of a greater endeavor – the common scheme or plan – which includes the charged offense. *Commonwealth v. English*, 993 S.W.2d 941, 945 (Ky. 1999). The hallmark of such evidence is that all parts of the common scheme or plan "tend to a common end." *Id.* at 943 (citing *Raymond v. Commonwealth*, 96 S.W. 515 (Ky. 1906) (Hobson, C.J., dissenting)).

At trial, K.W. testified that she lived at the Riggle household periodically when she was thirteen (13) years old. She testified that, on multiple occasions, Senior touched her breasts, smacked her buttocks, and "intimate[ly]" kissed her on the lips. K.W also testified that Angela, Alyssa, and Danielle were often in the room when Senior would inappropriately touch her. K.W. also testified that she witnessed Senior hit Angela, Alyssa, and Danielle "really hard" with belts. K.W. further testified that she witnessed Senior intimately kiss his minor relative, C.R. Perhaps most relevantly, K.W. testified that it was "natural" for people in the Riggle household to touch all of the young girls on the buttocks. K.W. testified such touching "always happened."

M.W. testified that she often stayed overnight at the Riggle household when she was eight (8) or nine (9) years old. M.W. testified that Senior would rub her back, touch her buttocks, and kiss her on the lips. M.W. further testified that she saw Senior kiss Danielle and C.R. on the lips, and touch Danielle's buttocks. M.W. also testified that she saw Senior inflict physical abuse on Angela, Alyssa, and Danielle.

8

Here, it is clear to us that K.W. and M.W.'s testimony was not offered merely to prove that Senior had a sexual proclivity toward young girls, but rather to prove that he cultivated a culture of abuse in his home that groomed his victims, namely Angela, Alyssa, and Danielle, to yield to that abuse. Each instance of unwanted sexual touching was "part and parcel" of that larger scheme or plan.

K.W. and M.W.'s testimony tends to prove that sexual touching was blatant and had become normalized in the Riggle household, that each of the young girls saw Senior inappropriately touch the others, and that Senior victimized Angela, Alyssa, and Danielle similarly to K.W. and M.W. before progressing the severity of his abuse. In fact, the prior bad acts that K.W. and M.W. testified to were similar to those described by Angela, Alyssa, and Danielle. Each victim was of similar age, each instance of touching occurred in the Riggle household, and the mode of unwanted sexual touching was the same. It is reasonable to conclude that each instance of alleged unwanted sexual touching perpetrated on Senior's victims further conditioned them to yield to further abuse. Each of the prior bad acts alleged by K.W. and M.W. were "part and parcel" of Senior's larger scheme to cultivate a culture of abuse that ensured his victims did not speak out. Thus, these pieces of evidence were relevant for a purpose other than proving propensity and satisfy the first *Bell* factor.

Such evidence, coming from the independent testimony of the alleged victims, was highly probative to prove the prior bad acts did, in fact, occur and

9

were perpetrated by Senior. As such, this evidence satisfies the second *Bell* factor.

This Court also places little credence in Senior's argument that the prior bad acts evidence in question was unduly prejudicial. Even if highly probative, evidence of prior bad acts may be excluded under KRE 403 if the prejudicial effects of admission would substantially outweigh that probative value. *St. Clair v. Commonwealth*, 455 S.W.3d 869, 889 (Ky. 2015). The evidence in question here was highly probative to rebut a major defense theory and was but a small portion of the evidence offered against Senior. We cannot say any prejudice substantially outweighed its probative value. Accordingly, this evidence satisfies KRE 403 and the third *Bell* factor.

We hold that the trial court did not abuse its discretion in admitting K.W. and M.W.'s testimony.

**B. Ms. Rosie's testimony was admissible for rehabilitative purposes.**

Senior contends that testimony from Angela's school counselor, Ms. Rosie, amounted to improper "bolstering" of Angela's own testimony. We review the trial court's decision to admit Ms. Rosie's testimony for an abuse of discretion, *Goodyear Tire & Rubber Co.*, 11 S.W.3d at 577, and conclude the testimony was properly introduced as non-hearsay evidence. We therefore affirm its admission.

During Angela's forensic interview, Angela told the forensic interviewer that she had reported her abuse to a school counselor while living with the Riggles. At trial, Angela consistently testified that while she was living with the

10

Riggles she told her middle school counselor that she was being abused. Angela could not initially remember the counselor's name, but when asked by the Commonwealth if that counselor was named "Ms. Rosie," Angela responded affirmatively. At trial, Angela confirmed that Ms. Rosie was the counselor she was referring to during her forensic interview. The timeline of Angela's disclosure to Ms. Rosie is crucial, as after Angela's forensic interview, Detective Robey contacted the school Angela had attended while living with the Riggles and was unable to confirm that she had disclosed any abuse to a school counselor.

Relevantly, while living with the Riggles, Angela attended Westport Middle School. However, Ms. Rosie worked for the West Washington School Corporation where Angela was enrolled *after* moving out of the Riggle household. This fact is plainly inconsistent with Angela's testimony that she reported her abuse to Ms. Rosie *during* her time at the Riggles. During opening statements, defense counsel highlighted this inconsistency by implying Angela's allegations were wholly false because someone at Westport Middle School would have reported them to the proper authorities if Angela was telling the truth:

> What they are wanting you to believe now is that little girls, cute little girls, went to school and told their teachers and counselors that they were being sexually abused and told them on multiple occasions and that they did nothing about it. Both things aren't true.

On cross-examination of Angela, defense counsel again highlighted this discrepancy in Angela's testimony to impeach her credibility:

11

> Defense Counsel: You said at first that you told a counselor at Westport Middle, where you were going to school with the Riggles, right?
>
> Angela: Yes.
>
> Defense Counsel: And I'm just sort of probing, is that true? That you did tell a counselor at Westport Middle School?
>
> Angela: Yeah.

The next day, the Commonwealth called Ms. Rosie who responded in the affirmative when asked by the Commonwealth whether Angela had ever told her that she was being sexually abused. Ms. Rosie confirmed that Angela "confided" in her on August 31, 2017 – which was after Angela had already moved out of the Riggle household. Ms. Rosie made no statements as to the veracity of Angela's allegations, expressed no opinion as to whether she believed Angela, and did not testify as to any details of Angela's allegations. Rather, during the entirety of her short testimony, Ms. Rosie described Angela's demeanor during their conversations, Angela's performance at school, and confirmed that she did report Angela's allegations to the Indiana Department of Child Services.

Senior argues that Ms. Rosie's testimony amounted to improper bolstering. The impermissible admission of a witness's prior consistent hearsay statements is often colloquially referred to as "bolstering." *See, e.g., Tackett v. Commonwealth*, 445 S.W.3d 20, 34-35 (Ky. 2014); *Smith v. Commonwealth*, 920 S.W.2d 514, 516 (Ky. 1995) (as modified on denial of rehearing (May 23, 1996)). However, a witness's prior consistent statements that would otherwise be hearsay are not excluded by the hearsay rule, and do not constitute improper

bolstering, when offered "to rebut an express or implied charge against the declarant of *recent* fabrication or improper influence or motive." KRE 801A(a)(2) (emphasis added). This hearsay exception applies generally to statements the declarant made *pre-dating* their supposed motive to fabricate their sworn testimony. Likewise, a witness's prior consistent statements made "post-motive" are naturally not barred by the hearsay rule when they do not constitute hearsay – namely when "offered primarily for rehabilitative, not substantive purposes." *Noel v. Commonwealth*, 76 S.W.3d 923, 929 (Ky. 2002). "In such a case, the statement is not admitted under KRE 801A(a)(2) as a prior consistent statement. Indeed, KRE 801A(a)(2) does not even address this scenario . . . ." *James v. Commonwealth*, 360 S.W.3d 189, 206 (Ky. 2012). Rather the statement is admitted as non-hearsay "because it is offered not for the truth of the matter but to 'rehabilitate . . . credibility.'" *Id.* (quoting *Engebretsen v. Fairchild Aircraft Corp.*, 21 F.3d 721, 730 (6th Cir. 1994)).

The foregoing standards apply sensibly to the facts at hand. Here, it is clear that Angela's testimony that she told Ms. Rosie that she was being sexually abused is *consistent* with Ms. Rosie's testimony that Angela had previously told her, on August 31, 2017, that she had been sexually abused. Such consistent statements might normally raise alarms of improper bolstering, as Senior argues. However, Ms. Rosie's testimony was not offered for the truth of the matter – that Angela had been abused – but was rather offered to explain the inconsistency in Angela's testimony regarding when she told Ms. Rosie about her abuse. This evidence went to rehabilitate Angela's credibility

13

after multiple insinuations from defense counsel that Angela had fabricated her testimony, including testimony that she had disclosed her abuse to a school counselor. As such, the admission of this non-hearsay evidence was proper, and we can find no abuse of discretion on the part of the trial court.

### C. Unanimity issues concerning jury instructions six (6) and nine (9) do not rise to palpable error.

Senior next argues that two (2) of the trial court's fourteen (14) instructions to the jury denied his right to a unanimous verdict on those charges. This argument is unpreserved, and Senior seeks palpable error review under Kentucky Rule of Criminal Procedure (RCr) 10.26. To the extent that instructions six (6) or nine (9) contain error, such error was not palpable, and we affirm Senior's convictions on these charges.

Instruction six (6) stated:

You will find Mr. Riggle, Sr. guilty of Sodomy in the First Degree under this Instruction if, and only if, you believe from the evidence beyond a reasonable doubt all of the following:

(A) That in Jefferson County sometime between January 1, 2010, and July 27, 2017, he engaged in deviate sexual intercourse with [Alyssa];

AND

(B) That at the time he did so, [Alyssa] was less than twelve (12) years of age.

\* "deviate sexual intercourse" means any act of sexual gratification involving the sex organs of one person and the mouth or anus of another.

At trial, Alyssa testified to an incident of oral sodomy that occurred in Senior's bedroom when she was "like eight" years old. She also testified to another

14

incident of oral sodomy that occurred in the shower on a day that Senior kept her home from school. Both incidents occurred in the time frame covered by instruction six (6), however, the instruction did not specify which of the two incidents the jury was to consider in rendering its verdict.

Instruction nine (9) stated:

You will find Mr. Riggle, Sr. guilty of Sodomy in the First Degree under this Instruction if, and only if, you believe from the evidence beyond a reasonable doubt all of the following:

(A) That in Jefferson County sometime between January 1, 2010, and July 27, 2017, he engaged in deviate sexual intercourse with [Danielle];

AND

(B) That at the time he did so, [Danielle] was less than twelve (12) years of age.

* "deviate sexual intercourse" means any act of sexual gratification involving the sex organs of one person and the mouth or anus of another.

At trial, Danielle described an incident of oral sodomy that occurred when she was in the sixth grade and Senior called her into his room and ordered her to perform oral sex on him. When she did not swallow his ejaculate, Senior "smacked" her. She also testified to another incident of oral sodomy that occurred when she was in elementary school and Senior shaved her pubic hair and placed his mouth on her vagina "for a couple of minutes and then he stopped." Both incidents occurred in the time frame covered by instruction nine (9), however, the instruction did not specify which of the two incidents the jury was to consider in rendering its verdict.

15

Both Senior and the Commonwealth agree that jury instructions six (6) and nine (9) present unanimity issues that constitute error by the trial court; they disagree, however, whether that error rises to palpable error. As this issue is unpreserved, no palpable error will be deemed to have occurred absent a finding of manifest injustice. *Sexton v. Commonwealth*, 647 S.W.3d 227, 232 (Ky. 2022). "An error results in manifest injustice if it 'so seriously affected the fairness, integrity, or public reputation of the proceeding as to be shocking or jurisprudentially intolerable.'" *Behrens v. Commonwealth*, 677 S.W.3d 424, 432 (Ky. 2023) (quoting *Martin v. Commonwealth*, 207 S.W.3d 1, 4 (Ky. 2006)). As in all cases "presenting an unpreserved error regarding a unanimous jury, [this Court] must plumb the depths of the proceeding and scrutinize the factual idiosyncrasies of the individual case. That includes a consideration of the weight of the evidence." *Johnson v. Commonwealth*, 676 S.W.3d 405, 417 (Ky. 2023) (internal quotation omitted). Such a consideration of the evidence should reveal "whether, but for the error, there is a 'substantial possibility of a different result.'" *Behrens*, 677 S.W.3d at 432 (quoting *Johnson*, 676 S.W.3d at 417).

After a review of the evidence, and its weight, we find that any error occasioned by instructions six (6) or nine (9) does not rise to the level of palpable error. Throughout this week-long trial, the jury heard each of Senior's victims testify to years of sexual abuse and exploitation. While it was apparent that Angela, Alyssa, and Danielle were incapable of recalling every instance in which Senior abused them, each girl was able to testify to numerous specific

16

occasions in great detail – including the incidents of sodomy at issue. In rebuttal to these hours of gut-wrenching testimony, Senior relied most heavily on a blanket defense that Angela, Alyssa, and Danielle had fabricated all of their allegations. Accordingly, there would be no reason for the jury to believe Danielle or Alyssa had been truthful about one instance of sodomy and untruthful about another. The same logic applies to the other twelve (12) counts of which Senior was convicted. In fact, the jury so believed Angela, Alyssa, and Danielle's version of events that it took less than ninety (90) minutes to convict Senior of all charges lodged against him. The overwhelming weight of the testimonial evidence against Senior convinces this Court that any error in jury instructions six (6) and nine (9) did not result in manifest injustice.

**D. The trial court did not err in failing to direct a verdict of not guilty as to Counts 65 and 66.**

Finally, Senior challenges the trial court's failure to grant his motion to direct a verdict of acquittal as to Count 66 – intimidating a witness in the legal process. Further, Senior requests palpable error review of his unpreserved claim that the trial court erred in failing to sua sponte direct a verdict of acquittal as to Count 65 – sexual abuse in the first degree. We hold the trial court did not so err, and affirm Senior's convictions as to these counts.

**1. Directed verdict standard**

Our directed verdict standard has been firmly established in *Commonwealth v. Benham*:

17

> On a motion for directed verdict, the trial court must draw all fair and reasonable inferences from the evidence in favor of the Commonwealth. If the evidence is sufficient to induce a reasonable juror to believe beyond a reasonable doubt that the defendant is guilty, a directed verdict should not be given. For the purposes of ruling on the motion, the trial court must assume that the evidence for the Commonwealth is true, but reserving to the jury questions as to the credibility and weight to be given to such testimony.

816 S.W.2d 186, 187 (Ky. 1991). "So long as the Commonwealth produces more than a mere scintilla of evidence to support the charges, a defendant's motion for directed verdict should be denied." *Taylor v. Commonwealth*, 617 S.W.3d 321, 324 (Ky. 2020). "On appellate review, the test of a directed verdict is, if under the evidence as a whole, it would be clearly unreasonable for a jury to find guilt, only then the defendant is entitled to a directed verdict of acquittal." *Benham*, 816 S.W.3d at 187.

## 2. Intimidating a participant in the legal process

To be found guilty of intimidating a participant in the legal process under Count 66, Senior must have used "physical force or a threat" against Angela to "[h]inder[], delay[], or prevent[] the communication to a law enforcement officer or judge of information relating to the possible commission of an offense or a violation of conditions of probation, parole or release pending judicial proceedings." KRS 524.040(1)(f). Relevant here, "threat" is defined as "any direct threat to kill or injure a person protected by this chapter or an immediate family member of such a person." KRS 524.010(8).

In the case at hand, Angela testified at trial that both Senior and Junior had "threatened" her, that they said, "you better not tell," and "then they made

18

us . . . swear on our little sister." Angela also testified that "at the time, I thought if I swore on my little sister, if I broke . . . the swear . . . that my little sister would die." Angela further testified that Senior would "sometimes . . . spank me because I was in trouble, on my butt" and that "sometimes it was on my cheek, and then I had a black eye." Multiple other witnesses also testified that Senior often inflicted physical abuse on Angela and her sisters.

When viewed in context with the years of systematic abuse that Angela and her sisters endured at the hands of Senior, it is clear to this Court that Senior's demand that Angela "swear on [her] little sister" constituted a "direct threat to kill or injure" Angela's sister should Angela break the promise "not [to] tell." While Senior might not have explicitly delineated the list of harms that would befall Angela's sister when he threatened her, the words that he did use directly conveyed to Angela that she should not tell anyone about the abuse he was perpetrating on her, or there would be physical consequences for her sister. To this Court, such a statement clearly constitutes a "direct threat." To hold otherwise would be to require a defendant to meticulously spell out the consequences that would follow his threat before he could be held criminally liable, something not required by this statute. In cases such as these, the context surrounding the Defendant's threat is perhaps as important as the words themselves.

Senior's threat against Angela's sister, made in conjunction with his statement that Angela "better not tell" anyone about his abuse, was clearly an attempt to "[h]inder[], delay[], or prevent[] the communication to a law

19

enforcement officer or judge of information relating to the possible commission of an offense . . . ." KRS 524.040(1)(f).

As there was sufficient evidence to support the charge against Senior of intimidating a participant in the legal process, it was not "clearly unreasonable for a jury to find guilt." *Benham,* 816 S.W.2d at 187. We affirm the trial judge's decision to deny Senior's motion for directed verdict as to this charge.

**3. Sexual abuse in the first degree**

To be found guilty of sexual abuse in the first degree under Count 65, Senior must have subjected Angela to "sexual contact" when she was less than twelve (12) years old. KRS 510.110(1)(b). "'Sexual contact' means the touching of a person's intimate parts or the touching of the clothing or other material intended to cover the immediate area of a person's intimate parts, if that touching can be construed by a reasonable person as being done . . . [f]or the purpose of sexual arousal or gratification of either party." KRS 510.010(7)(a). The jury was instructed to find Senior guilty of this count if he subjected Angela to sexual contact when he "touched her breasts."

At trial, Dr. Rebecca Hart, a physician who examined Angela shortly after she disclosed her abuse, testified that Angela "report[ed] being touched with hands on her breasts . . . ." Another victim who periodically lived in the Riggle household, K.W., testified that Senior would often touch her breasts in a specific manner guised as a "hug." She stated Senior would "hug **us,** inappropriately . . . he would go up behind **us** and grab **us** – **our** chests." When asked if she ever saw Senior abuse any of the three sisters, K.W. testified that

20

"sometimes he would smack their butt, or like grab **them** how the hug would be." From this testimony, it seems clear that K.W. was expressing that Senior would not only "hug" her in this invasive manner to touch her breasts, but that he would also touch the breasts of the three sisters in the household, including Angela, in the same manner.

To overcome a motion for directed verdict at the trial court, the Commonwealth need only produce "more than a mere scintilla of evidence." *Taylor*, 617 S.W.3d at 324. Taken together, Dr. Rebecca Hart's testimony and K.W.'s testimony are far greater than a mere scintilla. After all, in ruling on a motion for directed verdict, the trial court must draw all reasonable inferences in favor of the Commonwealth and leave questions of weight and credibility to the jury. *Benham*, 816 S.W.2d at 187. Here, while the Commonwealth's evidence establishing that Senior touched Angela's breasts did not come from Angela directly, the jury was entitled to give the evidence it did hear substantial weight. The jury heard from K.W. that Senior grabbed the "chests" of Angela and her sisters. This information was confirmed through the testimony of Dr. Hart who stated that Angela told her that Angela had been "touched with hands on her breasts." Finally, it goes without saying that, within the context of the systematic sexual abuse perpetrated by Senior, that Senior's touching of Angela's breasts could "be construed by a reasonable person as being done . . . [f]or the purpose of sexual arousal or gratification of" Senior. KRS 510.010(7)(a). Based on this evidence, "a reasonable juror [could] believe

21

beyond a reasonable doubt" that Senior was guilty of sexual abuse in the first degree. *Benham*, 816 S.W.2d at 187.

The standard for this Court sitting in appellate review of a motion for directed verdict is perhaps even more deferential than that used by the trial court. *Ficklin v. Commonwealth*, No. 2020-SC-0573-MR, 2022 WL 3640906, at *5 (Ky. Aug. 18, 2022). The trial court must only determine if the Commonwealth produced a mere scintilla of evidence in support of the charged offense. On appellate review, the trial court should only be reversed where "it would be **clearly** unreasonable for a jury to find guilt." *Benham*, 816 S.W.2d at 187 (emphasis added). Because the Commonwealth produced more than a mere scintilla of evidence to prove Senior touched Angela's breasts, it was not clearly unreasonable for the jury to find him guilty of sexual abuse in the first degree. Thus, the trial court did not err in failing to sua sponte direct a verdict of acquittal as to Count 65 – sexual abuse in the first degree, and certainly did not palpably err in doing so.

### III.    CONCLUSION

In all respects, the judgment of the Jefferson Circuit Court is affirmed.

All sitting. VanMeter, C.J.; Bisig, Conley, Lambert and Thompson, JJ., concur. Nickell, J., concurs in part, concurs in result only in part, and dissents in part by separate opinion.

NICKELL, J., CONCURRING IN PART, CONCURRING IN RESULT ONLY IN PART, AND DISSENTING IN PART.  Respectfully, I concur in part, concur in result only in part, and dissent in part.  Although I agree with much of the

22

majority's analysis, I cannot agree with that portion which affirms Senior's convictions for sexual abuse in the first degree and intimidating a participant in the legal process relative to Angela. My review of the record reveals there was a failure of proof on these two counts and Senior was entitled to directed verdicts on each. Thus, I dissent from those portions of the majority's Opinion. Further, to the extent the majority concludes Instruction Nos. 6 and 9 did not present unanimity violations, I disagree, but I nevertheless concur in the result of affirming the convictions obtained under those instructions as the errors presented did not rise to the level of being palpable.

**Count 65 (Instruction No. 4): Sexual Abuse in the First Degree (Angela)**

Under this count, Senior was charged with touching Angela's breasts when she was less than twelve years old. Angela, herself, did not testify to Senior touching her breasts, although she discussed many other sexual acts in great detail.

Dr. Rebecca Hart, the physician who examined Angela shortly after she disclosed the abuse, testified Angela told her that hands had touched her breasts, mouth, vagina, and anal area. Importantly, however, Dr. Hart did not state *who* had touched Angela in those areas—whether Senior, Junior, or some other person.

K.W. testified Senior would hug *her* from behind and move his hands to *her* breasts over her clothes. She stated she had seen Senior smack Angela and her sisters' buttocks and "like grab them how the hug would be."

23

However, she offered no specifics, particularly any involving Senior's touching of *Angela's* breasts, nor any timeframe in which these supposed acts occurred.

Senior thus argues the Commonwealth failed to prove he committed the particular act of first-degree sexual abuse as charged in this count. Although unpreserved, Senior contends the trial court's failure to direct a verdict on this charge constituted palpable error. I agree.

Even drawing all fair and reasonable inferences in the light most favorable to the Commonwealth, *Benham*, 816 S.W.2d at 187, the evidence adduced at trial was simply insufficient to support allowing this charge to go to the jury. Nowhere in the record is there any testimony upon which a finding that Senior had touched Angela's breasts might reasonably have been based. Indeed, the Commonwealth made no mention of this supposed contact during closing argument. Although vague testimony was given from Dr. Hart about *someone's* unattributed "hands" touching Angela's breasts and from K.W. about Senior hugging *her* and "*them*" from behind and touching K.W.'s breasts, the record is devoid of any direct evidence specifically asserting Senior subjected Angela to sexual contact by touching her breasts, the alleged conduct upon which the charge was founded.

Contrary to the majority's assertion, even when taking all of the evidence as a whole, no reasonable inference can be made from the silent record that it was Senior who touched Angela's breasts. There can be no doubt that countless acts of horrific sexual abuse occurred in the Riggle household— committed by both Senior and Junior—as proven by the direct, detailed, and

24

graphic testimony adduced at trial, and for which both have been properly convicted and severely sentenced. However, there was simply a failure of proof as to a basic element of this particular crime, as charged.

Because the Commonwealth failed to produce a scintilla of evidence of guilt, and because it was clearly unreasonable for the jury to make a finding of guilt based on such a vague and nonspecific record, I would hold the trial court palpably erred in failing to grant a directed verdict on this singular count of sexual abuse in the first degree.

### Count 66 (Instruction No. 5):  Intimidating a Participant in the Legal Process (Angela)

Under this count, Senior was charged with intimidating a participant in the legal process based on his allegedly threatening Angela when he stated, "you better not tell" and made her "swear on her little sister." Angela testified that she understood this perceived threat to mean Senior would kill her sister if she broke her promise and told anyone about his sexual abuse—even though her sister did not reside in the Riggle residence. Even so, while testifying Junior had directly threatened her with weapons, she denied Senior had ever done so, and she attributed no other threats to Senior.

Based on the foregoing, Senior again asserts an insufficiency in the Commonwealth's proof entitled him to a directed verdict. I agree.

KRS 524.040(1) states, in pertinent part:

[a] person is guilty of intimidating a participant in the legal process when, by use of physical force or a threat directed to a person he believes to be a participant in the legal process, he or she:

. . .

25

(f) Hinders, delays, or prevents the communication to a law enforcement officer or judge of information relating to the possible commission of an offense or a violation of conditions of probation, parole or release pending judicial proceedings.

"Threat" is defined in KRS 524.010(8) as "any direct threat to kill or injure a person protected by this chapter or an immediate family member of such a person." An official proceeding does not need to be pending at the time of the offense. KRS 524.040(2)(a). There must only be some "reasonable nexus" between the threat and the legal process. *Edmonds v. Commonwealth*, 433 S.W.3d 309, 321 (Ky. 2014). Moreover, "it is certainly apparent to a person who commits a crime that the victim *may* be a witness against him in a legal proceeding." *Id.*

Senior argues Angela's testimony was insufficient to allow presentation of this intimidation charge to the jury. Contending there were no direct threats to kill or injure a specific person—whether Angela, her sister, or anyone else— Senior argues there was a failure of proof on an essential element of the charged crime, thereby entitling him to a directed verdict.

More specifically, Senior in essence argues—absent additional words or actions manifestly conveying a threat of some particular consequential harm in the event of her revelation regarding his sexual abuse—any demand that Angela "swear on [her] little sister" could not be reasonably understood to constitute a direct threat against Angela or her sister should Angela break her promise to remain silent. Importantly, while Angela stated her belief as to what Senior meant when making her "swear on her little sister," she did not allege

26

Senior had exerted any physical force or voiced any further utterance indicating or expressing a specific threat of future harm to Angela or her sister if she reneged on her promise.

Angela's subjective belief does not equate to objective evidence of Senior's intent to intimidate and is an insufficient basis upon which to conclude Senior's actions rose to the level of a "threat" as that term is narrowly defined in KRS 524.010(8). *See Godby v. Commonwealth*, 187 S.W.3d 857, 861 (Ky. App. 2005) (holding legislature's 2002 amendment which added the statutory language in KRS 524.010(8) evidenced an intent to restrict the definition of "threat"). Although Angela and the Commonwealth construed Senior's words as threatening, I cannot conclude his command for Angela to "swear on her little sister" constituted a "direct threat to kill or injure" anyone as required under the statutory definition.

Regardless of any commonly held understanding of what words or actions may arguably constitute a threat, the General Assembly has chosen to limit the definition of the term, and we are not at liberty to expand it. *See* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 226-28 (2012) ("When . . . a definitional section says that a word 'means' something, the clear import is that this is its *only* meaning . . . . [T]he established meaning of a word must yield to the statutory definition."). "It is beyond dispute that whenever a statute is amended, courts must presume that the Legislature intended to effect a change in the law." *Brown v. Sammons*, 743 S.W.2d 23, 24 (Ky. 1988).

27

The majority asserts the "context" of this case militates in favor of a finding Senior's words constituted a threat because Angela was allegedly aware of his capacity to inflict physical abuse. However, that is not the standard. In relying on conjecture and speculation, the majority's analysis ignores the plain language of the statutes. KRS 524.010(8) requires more than an implied or veiled threat; there must be a *direct* threat to *kill or injure* a specified person. In the present case, any alleged threat was vague, unclear, and ambiguous. Although the threat of violence may arguably have been implied by Senior's command for Angela to "swear on her little sister," an inference alone is insufficient to satisfy the particularized requirements of the statutory definition.

Absent proof of a direct threat or actual use of physical force, this Court is statutorily constrained to hold there was insufficient evidence to meet the legal requirements under the definitional section to justify this charge of intimidating a participant in the legal process. Here, the prosecution failed to produce even a mere scintilla of the statutorily mandated evidence and it was clearly unreasonable for the jury to find guilt. *Benham*, 816 S.W.3d at 187-88. Thus, under the facts and circumstances of this case, I must conclude the evidence was insufficient to support Senior's conviction for intimidating a participant in the legal process and the trial court incorrectly denied Senior's motion for a directed verdict.

I am aware Senior's sentence would not be impacted by reversing these two convictions as we are affirming the two challenged first-degree sodomy

28

charges for which he received consecutive twenty-five-year sentences. Those sentences were also to run consecutively to a third first-degree sodomy charge which was not challenged on appeal, for a total sentence of seventy-five years. The five and ten-year sentences on the charges which I believe should be reversed were to run concurrently with the lengthier consecutive terms. Thus, his sentence would still exceed the statutory cap found in KRS 532.110(1)(c). Nevertheless, justice demands he stand convicted only of those crimes for which the Commonwealth presented sufficient proof.

**Instruction Nos. 6 and 9 present unanimity violations but no palpable error resulted**

Section 7 of the Kentucky Constitution guarantees criminal defendants the right to unanimous jury verdicts. *See also* KRS 29A.280(3); RCr 9.82(1); *Cannon v. Commonwealth*, 291 Ky. 50, 163 S.W.2d 15, 15-16 (1942). As a matter of law, this Court reviews unanimity errors de novo. *Smith v. Smith*, 563 S.W.3d 14, 16 (Ky. 2018) (quoting *Sargent v. Shaffer*, 467 S.W.3d 198, 204 (Ky. 2015)).

Senior asserts the two challenged instructions permitted the jury to convict him of a single crime although the proof at trial showed multiple instances of criminal conduct which could satisfy the elements of each crime charged. Thus, he argues it is impossible to determine which criminal act all twelve jurors agreed upon to convict him, and therefore, his right to a unanimous verdict was denied. This Court has held "a general jury verdict based on an instruction including two or more separate instances of a criminal offense, whether explicitly stated in the instruction or based on the proof—

29

violates the requirement of a unanimous verdict." *Kelly v. Commonwealth*, 554 S.W.3d 854, 864 (Ky. 2018) (citations omitted).

Senior concedes he did not preserve his challenges and requests palpable error review. As these issues are unpreserved, absent a finding that manifest injustice resulted, no palpable error will be deemed to have occurred. *See Sexton v. Commonwealth*, 647 S.W.3d 227, 232 (Ky. 2022) (holding that "reversal is not the universal, essential result of a unanimous verdict error. Where manifest injustice will not result, this Court can find no palpable error"). "In all cases presenting an unpreserved error regarding a unanimous jury, the courts must 'plumb the depths of the proceeding' and scrutinize the factual idiosyncrasies of the individual case. That includes a consideration of the weight of the evidence." *Johnson v. Commonwealth*, 676 S.W.3d 405, 417 (Ky. 2023) (quoting *Martin*, 207 S.W.3d at 4) ("*Johnson II*").

Senior challenges jury instructions 6 and 9 as being duplicitous. The Commonwealth concedes the instructions contain error but argues the errors do not rise to the level of being palpable or requiring reversal. The majority posits no unanimous verdict issue resulted from the erroneous instructions before proceeding to analyze the alleged error and concluding no palpable error occurred. While I agree with the majority's ultimate result, I believe that this Court's binding precedents plainly mandate the conclusion the instructions did, in fact, present a unanimity violation, and thus concur in result only on this issue.

30

As to each of these instructions, Senior asserts they were duplicitous in that each one allowed the jury to convict him of a single crime based on two criminal acts which allegedly occurred on different dates, but which also violated the same criminal statute.[4]  I agree.

> When . . . the instruction does not specify which specific act it is meant to cover, we cannot be sure that the jurors were unanimous in concluding the defendant committed a single act satisfying the instruction.  Instead, the jury's verdict only reflects their unanimous view that the defendant committed the crime, without necessarily resulting in a unanimous conclusion that the defendant committed a single criminal act beyond a reasonable doubt.

*Martin v. Commonwealth*, 456 S.W.3d 1, 6 (Ky. 2015), *abrogated on other grounds by Sexton*, 647 S.W.3d at 232.  Alyssa and Danielle each testified to having endured two separate and distinct sodomies, and the instructions quoted above allowed the jury to convict Senior on the basis of either.  This is not an instance of alternative theories supporting a single offense but is rather the type of error condemned in *Johnson v. Commonwealth*, 405 S.W.3d 439 (Ky. 2013), *overruled on other grounds by Johnson II*, 676 S.W.3d at 417 ("*Johnson I*").

In *Johnson I*, the victim suffered two injuries at the hands of the defendant at two different times.  *Id.* at 448.  Either injury was sufficient to support a conviction of first-degree criminal abuse.  *Id.*  The defendant was

---

[4]  It is worth noting that none of Senior's crimes were charged as a continuing course of conduct against a vulnerable victim pursuant to KRS 501.100, presumably because the vast majority of his actions occurred prior to the effective date of that statute, thereby making it inapplicable.

31

convicted of criminal abuse under a single crime instruction. *Id.* at 447-48. This Court concluded a unanimous verdict violation occurred because it was possible some jurors cast a guilty vote based on one injury while other jurors relied on the other injury in support of their vote for a guilty verdict. *Id.* at 457.

*Johnson I* plainly stands for the proposition that a verdict is not unanimous unless all jurors base their vote for conviction on the same criminal act. Furthermore, the instructions must include language eliminating any possible ambiguity regarding the jury's accord. "Without an instruction to channel the jury's deliberation, the jury was left to adjudicate guilt on any or all of the vaguely alleged incidents, resulting in a verdict of doubtful unanimity." *Ruiz v. Commonwealth*, 471 S.W.3d 675, 679 (Ky. 2015).

For these reasons, Instructions 6 and 9 were duplicitous and violated the rule laid down in *Johnson I* and *Ruiz*.[5]

Having concluded Instructions 6 and 9 were erroneous, the determination must be made as to whether those errors were palpable. Our recent decisions in *Sexton* and *Johnson II* have made clear that unpreserved unanimity errors are no longer to be considered structural errors which automatically require reversal, thereby abandoning our previously held

---

[5] The majority's suggestion that the instructions in this case presented no unanimity issue can be traced to the view espoused by Justice Cunningham's partial dissent in *Johnson I*. Although raised numerous times over the past decade, this position has failed to garner more than three concurring votes and thus remains a minority view.

minority position. Instead, we have returned to an individualized analysis of the facts of the case to determine whether a manifest, fundamental, and unambiguous error occurred whereby the integrity of the judicial process is threatened. *Martin v. Commonwealth*, 207 S.W.3d 1, 5 (Ky. 2006).

After reviewing the evidence previously set forth, I agree with the majority and cannot conclude the instructional errors here were palpable. Senior was plainly apprised of the numerous charges lodged against him. The victims' incriminating testimony was clear and unrebutted relating to the appalling sexual exploitations they endured. The various allegations were not complex, nor would they have been confusing to the jurors. Rather, the jury heard ample damning and unrebutted trial testimony to reasonably support its convictions of Senior for the crimes for which he stood accused. Thus, having "plumb[ed] the depths of the proceeding," *id.* at 4, and considered the weight and strength of the evidence, I am convinced the problematic instructions did not subject Senior to a manifest injustice. There can be no reasonable doubt the instructional errors did not contribute to the verdicts of guilt and there was no possibility of a different result absent the errors. The integrity of the judicial process was not threatened. *Id.* at 5. Thus, no palpable error occurred, and I concur with the majority's result.

For these reasons, I am compelled to concur in part, concur in result only in part, and dissent in part.

33

COUNSEL FOR APPELLANT:

Joshua Michael Reho
Louisville Metro Public Defender's Office


COUNSEL FOR APPELLEE:

Daniel J. Cameron
Attorney General of Kentucky

Todd Dryden Ferguson
Assistant Attorney General